UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WILLIAM KAYE, not individually but solely
in his capacity as Liquidating Trustee of
the DUKE & KING ACQUISITION CORP.
LIQUIDATING TRUST,

Plaintiff,

v.                                                        ADV 12-3319

NATH COMPANIES, INC., NATH MINNESOTA
FRANCHISE GROUP, INC., NATH ILLINOIS
FRANCHISE GROUP, INC., NATH FLORIDA
FRANCHISE GROUP, INC., NATH MIAMI
FRANCHISE GROUP, INC., NATH MINNESOTA
OPERATING GROUP, LLC, NATH ILLINOIS
OPERATING GROUP, LLC, KINDERHOOK
INDUSTRIES, LLC, KINDERHOOK CAPITAL
SBIC FUND I, LP, KINDERHOOK CAPITAL
FUND I, LP, ROBERT MICHALIK, LOUIS AURELIO,
CHRISTIAN MICHALIK, PAUL G. CIFELLI, and
RODGER HEAD,

Defendants.

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *03/31/2014*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

*******************************************************************************************************************

## ORDER RE:  MOTIONS FOR DISMISSAL

*******************************************************************************************************************

At St. Paul, Minnesota.
March 31, 2014.

This adversary proceeding came before the court on separate motions for dismissal brought by two groups of defendants.  The group of defendant-movants headed by Nath Companies, Inc.[1] appeared by their attorneys, Lara O. Glaesman and Jennifer L. Olson.  The group headed by Kinderhook Industries, LLC[2] appeared by their attorney, S. Steven Prince.  Mark S. Melickian and Leland H. Chait appeared on behalf of Plaintiff Kaye.  The following decision takes account of the text of the Plaintiff's complaint [Dkt. No. 1], the two motions, the multiple layers of follow-up filings, and the oral argument.

## PROCEDURAL HISTORY

Collectively, the Debtors operated a group of more than 90 franchised Burger King restaurants in several Midwestern states and Florida, from late 2006 until mid-2011.  On December 4, 2010, the Debtors filed petitions for relief under Chapter 11 in this district.  Early on, the court ordered joint administration of the cases.

Over the ensuing months, the court authorized the Debtors to use a sale process under 11 U.S.C. § 363, through which all of their operating locations were to be liquidated for the benefit of creditors.  After an auction procedure was completed and the results were court-approved, nearly all of the locations were sold in several groups; there were four buyers in total.

---

[1]Namely, Nath Companies, Inc., Nath Minnesota Franchise Group, Inc., Nath Illinois Franchise Group, Inc., Nath Florida Franchise Group, Inc., Nath Miami Franchise Group, Inc., Nath Minnesota Operating Group, LLC, and Nath Illinois Operating Group, LLC; hereafter, collectively, "the Nath Defendants."

[2]Namely, Kinderhook Industries, LLC, Kinderhook Capital SBIC Fund I, LP, Kinderhook Capital Fund I, LP, Robert Michalik, Louis Aurelio, Christian Michalik, and Paul G. Cifelli; hereafter, collectively, "the Kinderhook Defendants."  Where individual reference to a defendant who is a natural person is required, the surname will be used.

The Debtors' going-concern operations ceased when the sales were closed on May 26, 2011.

The Debtors and the Committee of Unsecured Creditors jointly proposed a liquidating plan after that.  The plan provided for the creation of a trust through which remaining assets were to be liquidated; causes of action for avoidance and other recovery were to be pursued; and ultimately the net resultant value would be distributed to the Debtors' creditors.  The plan provided for the substantive consolidation of the Debtors, for the post-confirmation administration.  William Kaye, who as nominee of the Coca Cola Company had been the chair of the Unsecured Creditors' Committee, was proposed as liquidating trustee.

The plan was confirmed on October 21, 2011.  The trust was created, and Kaye was seated as liquidating trustee.

During his administration Kaye resolved potential disputes over the allowance and amount of claims.  He addressed insurance-related issues; he evaluated preference causes of action and pursued some of them; and he made a first, small-percentage distribution from the residuum of the sale proceeds and the results of his post-confirmation activity.

The litigation at bar is Kaye's last significant undertaking.  It is also the only one that could enable any significant additional distribution to unsecured creditors.[3]  He filed the complaint for this adversary proceeding on December 3, 2012.

---

[3]The joint disclosure statement forecast an "Estimated Projected Recovery" of "19% - 38%" to the holders of general unsecured claims [BKY 10-38652, Dkt. No. 428, 5].  Some months into his administration, Kaye announced that a distribution in that magnitude was not likely.  He blamed that on the disclosure statement's estimate of "no more than $50,000 in post-confirmation professional expenses" being "far short of realistic, in light of the scope of the activities that the Liquidating Trustee has commenced or will commence shortly . . . ."  He also thought it material that the "Debtors' corporate records [had been] incomplete . . . ."  Notice of Hearing and Initial Quarterly Status Report of the Liquidating Trustee [BKY 10-38652, Dkt. No. 537, 8].  (There was no acknowledgment that Kaye himself had chaired the Unsecured Creditors' Committee, a co-proponent of the plan that presumably had major input into the content of the disclosure statement.)

## NATURE OF ADVERSARY PROCEEDING

Through this lawsuit, Kaye basically seeks to undo one side of the 2006 transaction through which the Debtors purchased 88 (perhaps 89) franchised Burger King restaurants from the Nath Defendants.  He seeks a money judgment in the liquidating trust's favor to recover the full purchase price paid to the Nath Defendants.  Complaint, ¶ 7.  He also seeks to recover certain "fees" paid to the Kinderhook Defendants in connection with the sale and after the Debtors commenced operation.  Complaint, ¶ 8.  He would route this relief by avoiding the payments as fraudulent transfers.  He relies on state law as the substantive rule of decision and he invokes 11 U.S.C. § 544 for his empowerment to do so.[4]

Kaye also pleads a claim for money damages against all of the Kinderhook Defendants and Defendant Head.  This separate claim is premised on the allegation that they breached fiduciary duties owed to the Debtors' creditors, in the way they constituted, capitalized, incorporated, and operated the Debtors for and after the purchase of the restaurant locations.  As subsidiary relief, Kaye seeks to have the Kinderhook Defendants' claims in the underlying cases (which are premised on further, unpaid "fees" owing) subordinated or recharacterized to the status

---

[4]Section 544(b) empowers a trustee to "avoid any transfer of an interest of the debtor in property. . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable" in a bankruptcy case under 11 U.S.C. § 502.  In application, this enables the trustee to invoke the state substantive law of fraudulent transfer, if an unsecured creditor could have used it outside of bankruptcy to challenge its debtor's transfers of assets.  *E.g.*, *In re Marlar*, 267 F.3d 749, 755-756 (8th Cir. 2001); *In re Popkin & Stern*, 223 F.3d 764, 769 n.11 (8th Cir. 2000); *In re Estate of Graven*, 64 F.3d 453, 456 n. 5 (8thCir. 1995); *In re Graven*, 936 F.2d 378, 383 n.7 (8th Cir. 1991); *In re DLC, Ltd.*, 295 B.R. 593, 601 (B.A.P.8th Cir. 2003).  Under the confirmed plan, the liquidating trust was granted "the rights of the Debtors for all matters pertaining to the [bankruptcy] Cases and [was] empowered generally to . . . administer the trust's assets and to commence suit on . . . Causes of Action."  Third Amended Joint Chapter 11 Plan of Liquidation [BKY 10-38652, Dkt. No. 464], ¶¶ 3.3.1(b) and (s).  In turn, "Liquidating Trust Assets" include "Causes of Action, including the Avoidance Actions"; "Causes of Action" include "rights of suit generally, including all claims and causes of action against officers, directors and other agents, employees and professionals arising in either tort or contract."  Exhibit A to Third Amended Joint Plan, ¶ 21.  "Avoidance Actions" include actions to avoid fraudulent transfers under 11 U.S.C. §§ 544 and 548.  Exhibit A to Third Amended Joint Plan, ¶ 9.  Finally, "[t]he powers, rights and responsibilities of the Liquidating Trustee . . . shall include the authority and responsibility to fulfill the items identified in [the] Plan."  Third Amended Joint Plan, ¶ 3.3.3.b.  None of the Defendants disputed Kaye's authority to prosecute this adversary proceeding; but in any event the interaction of these provisions does vest him with the authority.

4

of equity for their treatment in any further distribution in liquidation.

## MOTIONS AT BAR

The Nath Defendants and the Kinderhook Defendants elected to bring motions for dismissal under Rule 12(b)(6) as their first response to Kaye's complaint, in lieu of filing answers.[5] Thus this matter is still in a pre-discovery posture. The content of the complaint is the only material to be considered in passing on whether Kaye has a cognizable basis for suit against the movant-defendants, in alleged fact and applicable law.[6]  In evaluating that, the allegations in Kaye's complaint are to be assumed as true and all reasonable inferences of fact are to be directed in favor of him as plaintiff, for the purposes of analysis on dismissal. *E.g.*, *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010).

That deference is more qualified since the Supreme Court's recent issuance of two major opinions under Rule 12(b)(6).  Now, "a complaint must *contain* sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible on its face,*'" if it is to pass muster in the face of a motion for dismissal.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547, 127 S.Ct. 1955, 1960 (2007)) (emphasis added).  To meet this standard, the facts pled must show more than just a "sheer possibility" of

---

[5]Fed. R. Bankr. P. 7012(b) makes Fed. R. Civ. P. 12 applicable to adversary proceedings brought in bankruptcy cases.  Fed. R. Civ. P. 12(b) allows certain defenses to be asserted by motion rather than responsive pleading, as long as the motion is made before a responsive pleading is filed.  Rule 12(b)(6), of course, permits the dismissal of a lawsuit for the plaintiff's "failure [in its complaint] to state a claim upon which relief can be granted."

[6]There is authority that allows a trial court to consider the content of contracts and other documents extrinsic to a complaint but which are material to the causes of action sued-out, if the complaint appends them or merely makes reference to them.  *E.g.*, *M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 616 F.3d 872, 876 (8th Cir. 2010) and *Stahl v. U.S. Dept. of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) (both holding that court may consider language of contract that is subject of claims in litigation, in passing on sufficiency of complaint); *In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W. 2d 494, 497 (Minn. 1995) (ditto, applying Minnesota state rules for pleading); *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) and *State ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999) (more generally, court may consider "some materials that are part of the public record or do not contradict the complaint" in treating a motion for dismissal under Rule 12(b)(6), even though such material is not itself within complaint's fact-pleading).  This is not the situation for that, other than taking judicial notice of the recitations in several documents filed in the underlying bankruptcy cases.

proving the claim on its merits. *Iqbal*, 556 U.S. at 663. To be plausible, fact-pleading must be enough to support a "reasonable inference that the defendant is liable for the [conduct] alleged." *Id.* The pleaded facts must "affirmatively and plausibly suggest that [the plaintiff] has the right [it] claims"; the pleading of "facts that are merely consistent with such a right" will not suffice, if they do not meet all the elements under law. *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007) (citing *Twombly*, 550 U.S. at 554-557). A "formulaic recitation of the elements of a cause of action," in conclusory legal terminology alone, will not suffice. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

## TREATMENT OF MOTIONS

### I.  Relevant Content of Complaint

The plausibility inquiry under *Twombly* and *Iqbal* focuses on pleaded facts. Kaye pleads many, many facts. His recitation of generally-applicable facts runs 21 pages. Then there are the 16 pages setting forth ten substantive counts. They contain additional assertions of fact, or mixed assertions of fact and law.

### A.  Pleading of Transactional History

Kaye pleads the history, circumstances, and terms of the 2006 sale and the associated post-petition transfers, as follows:

1.  At all relevant times, Defendant Nath Companies, Inc. was a holding company that owned 100% of the equity in all of the other Nath Defendants. Complaint, ¶ 31. The remaining Nath Defendants were the operating entities for 97-plus franchised Burger King restaurants located in Minnesota, Wisconsin, Iowa, Illinois, and Florida. Complaint, ¶¶ 30 and 31.

2.  The three artificial-entity Kinderhook Defendants are a private equity firm "that specializes in investing and managing middle market companies." Complaint, ¶ 43. (Apparently, this is meant in a collective sense.) The natural persons among the Kinderhook Defendants were all officers or directors of the Kinderhook entity-defendants, at relevant

6

times.  Complaint, ¶¶ 35-38.[7]

3.    By late 2004, the management of the Nath Defendants wished to sell "almost all of its Burger King franchises." Complaint, ¶ 41.

4.    In 2005, the Kinderhook Defendants went through two separate phases of interest in purchasing the Nath Defendants' Burger King operations.  Complaint, ¶¶ 43-46. The second effort came later in the year.  In October, 2005, it resulted in the execution of an Asset Purchase Agreement for the Nath Defendants' sale of 89 of their Burger King restaurants ("the APA").  Complaint, ¶ 47.

5.    The Kinderhook Defendants formed Duke and King "to pursue the . . . purchase" from the Nath Defendants.  One or more of the Kinderhook entity-defendants were the "primary investor" in Duke and King.  Complaint, ¶¶ 1, 46.[8]

6.    After three amendments of the APA, the Nath Defendants sold 88 (possibly 89)[9] Burger King restaurant locations to Duke and King.  The closing took place on October 31, 2006, a year after the first version of the APA was signed. Complaint, ¶¶ 48 and 71.  The base purchase price was $23.5 million.  Complaint, ¶¶ 71-72.

---

[7]The sole remaining defendant, Rodger Head, is alleged to have been the CEO, president, and a director of the Debtors from mid-2006 to December, 2010.  He has not responded to Kaye's complaint. Kaye's claims against him are not implicated by the motions at bar.

[8]Starting in its very first numbered allegation, Kaye's pleading uses a generic term of reference, "Duke," for the actor/active party on the side of the Debtors in all of the relevant events of sale, purchase, and transfer.  He never defines the reference.  As a result, one cannot link any specific Debtor-entity to any particular pleaded act.  For instance, it is not recited in the pleading whether any of the Debtors other than Duke and King Acquisition Corp. were formed to be direct recipients of any assets in the sale.  The substantive consolidation of the Debtors as an incident of plan confirmation--long after the fact and purely on the plane of administrative procedure--gives no excuse for this vagueness in fact-pleading as to past historical acts and events.  To convey whatever factual sense results from Kaye's pleading, the reference "Duke and King" will be used generally, instead of "Duke."  It will denote whatever the original pleading connoted.  There is the same problem with Kaye's generic reference to "Kinderhook," which he defines as "individually or collectively, the Kinderhook entities."  Complaint, p. 2.  It is a little easier to parse out the Kinderhook Defendants' position in relation to Kaye's claims, because he does specify particular persons and entities in his subsidiary prayer for relief in each count.

[9]The number varies in the pleading.  *Compare* Complaint, ¶¶ 42 and 47, *with* Complaint, ¶ 73. The difference may be attributable to the deletion of one restaurant from the final sale, Complaint, ¶¶ 48 and 69; but nonetheless, the complaint's factual references are inconsistent without full explanation.

7.     Compiled data on the restaurants' historical operations and
       financial posture was extant as of the date of the sale and
       was available to the Kinderhook Defendants.   Complaint,
       ¶ 54.  It consisted of the following:

       a.     The so-called "Flame Report," prepared by a
              consultant called Mastodon Ventures, Inc.
              The Nath Defendants had engaged Mastodon
              Ventures to prepare marketing materials for
              the stores to be sold.   Complaint, ¶ 42.
              Issued in March, 2005, the Flame Report was
              based on the "financials [of Defendant Nath
              Companies, Inc.] through December 31,
              2004."  It "was never updated to reflect . . .
              performance after December 31, 2004,
              although Duke's acquisition of NCI [sic] took
              place 22 months after the last financial report
              included in the Flame Report's analysis."
              Complaint, ¶ 42.

       b.     The so-called "Crowe Report," commissioned
              by the Kinderhook Defendants in early 2005
              during their first show of interest.   Initially
              issued on the financial performance of
              Defendant Nath Companies, Inc. through
              March 31, 2005, the Crowe Report was "later
              updated . . . to include an evaluation of . . .
              financial performance from May 31, 2005-May
              31, 2006."  Complaint, ¶ 43.

8.     The Kinderhook Defendants did not get the Crowe Report
       updated to reflect any of the Nath Defendants' operations
       between May 31, 2006 and the closing of the sale on
       October 31, 2006.  Complaint, ¶ 44.  The Flame Report was
       never updated from its period-end at December 31, 2004.
       Complaint, ¶ 42.

9.     At their issuance, and certainly by the time the sale closed,
       the Flame Report and the Crowe Report did not accurately
       reflect the restaurants' and the Nath Defendants' profitability,
       liquidity, working capitalization, and net worth:

       a.     The Burger King Corporation's franchise
              agreements required the Debtors to perform,
              at their own expense, several types of cyclical
              repair, updating, and remodeling of the
              restaurants' facilities (denoted "CAPEX" in the
              franchise agreements, for the "capital
              expenditures" that would fund them).   Neither

8

report included "an in-depth analysis" of impending CAPEX obligations. Complaint, ¶ 65. Some of this maintenance had been deferred during the Nath Defendants' ownership. Complaint, ¶¶ 52, 110, 118, and 202.c. Neither report adequately disclosed the very substantial sums of money that would be required to meet CAPEX requirements in 2006 - 2009. Complaint, ¶¶ 61-63. The Nath Companies were aware of the requirements from a "scope of work and cost estimate" for years 2006 through 2009 issued by the Burger King Corporation, on an inspection of the Nath Defendants' restaurants done in late 2005. Complaint, ¶ 62.

b.     The Flame Report had contained "a positive, growth-oriented story of the franchises," based on recitations of data for operations through the end of 2004 and analysis of that period alone. Complaint, ¶¶ 57-59. It projected adjusted net store profit margins of greater than 12% for the years after 2004, using assumptions and the performance through 2004. Complaint, ¶ 59. However, the Nath Defendants' "actual performance in 2005 and 2006 materially undercut the Flame Report's projections," by significant percentage-points lower. Complaint, ¶ 60. The Nath Defendants' net working capital declined by nearly 40% (from ($7 million) to ($9.6 million)) between May 31, 2005 and May 31, 2006. Complaint, ¶ 50.[10]

c.     From late 2004-on, the Nath Defendants had engaged in a pattern of late payment on their accounts payable with Reinhart Foods, their largest vendor of inventory. Complaint, ¶ 51. Neither of the reports assigned any consequence to this in their projections, whether in the ordinary course or upon any sale of restaurant operations. Complaint, ¶ 66.

---

[10]Under the accounting profession's standards of notation, such numbers between parentheses reflect deficits below the zero-mark. Kaye does not state that he is using this convention.

10. The terms of the APA required the Nath Defendants to meet outstanding CAPEX obligations, but to the extent of only $550,000.00. Complaint, ¶ 64. The APA made no express provision in the purchase price for any of the substantial CAPEX obligations (totaling $4.8 million to $5.7 million) that would mature over the balance of the 2006-2009 period, or the balance of CAPEX for deferred maintenance that was due in 2006 ($1.9 million to $2.5 million). *Id.*

11. After the Nath Defendants' sale to Duke and King closed, Reinhart Foods reduced the grace period for payment on invoice for the account for the restaurants, from 28 days after issuance to 14. Complaint, ¶ 66. A purchasing cooperative, Restaurant Services, Inc., set the terms of Burger King franchisees' payment obligations on all vendor purchases. Those terms gave Duke and King no power to resist Reinhart Foods's acceleration. Complaint, ¶ 67. Duke and King "knew or should have known that Reinhart was going to accelerate its payment terms if the franchises were sold to" Duke and King. *Id.* The tightening of credit terms for the great majority of Duke and King's inventory purchases "had a material, and foreseeable, impact on [Duke and King's] short-term liquidity." Complaint, ¶ 68.

As to the Kinderhook Defendants' involvement in the sale and the Debtors' post-sale

operations, Kaye pleads the following:

12. The Kinderhook entity-defendants "formed Duke [and King] to pursue the . . . purchase [from the Nath Defendants], and [Duke and King's] acquisition of the [Nath Defendants'] restaurants was its [sic] first transaction in the fast food business." Complaint, ¶¶ 2, 46. Duke and King's Board of Directors was "made up primarily of Kinderhook insiders." Complaint, ¶ 5.

13. When the Kinderhook Defendants expressed their first interest in purchasing in early 2005, the Nath Defendants' own operation of the subject restaurants "was in financial distress"; "and [it] had been for years." Complaint, ¶ 49. The financial performance of the Nath Defendants' operations "continued to deteriorate" during the year between the execution of the first form of the APA in October, 2005, and the October 31, 2006 closing on the sale. Complaint, ¶ 48. "In the course of its due diligence [for the purchase], Kinderhook was aware, or should have been aware, of these significant and ongoing problems with [the Nath Defendants'] operations." Complaint, ¶ 53.

10

14. Concurrently with the closing on October 31, 2006, the Kinderhook entity-defendants entered a Management Services Agreement ("MSA") with Duke and King. Complaint, ¶ 76. This contract obligated Duke and King to pay the Kinderhook entity-defendants a "fee" of $250,000.00 per year, in advance via quarterly installments, "for management services that [they were] to provide to Duke [and King]." *Id*. The amount of this fee was premised on the assumption that 500 hours of service would be provided annually and $500.00 per hour would be the rate. *Id*. The MSA provided for subsequent adjustment if a full 125 hours of service were not provided to Duke and King in a quarter. *Id*. The Kinderhook entity-defendants used their control of Duke and King's Board of Directors to procure the entry into the MSA. Complaint, ¶ 77.

15. At the sale closing, $41,667.00 was distributed to the Kinderhook entity-defendants as an advance payment on management fees for the balance of the fourth quarter of 2006. Complaint, ¶ 78. Between then and the Debtors' bankruptcy filings, the Kinderhook entity-defendants received a total of $354,167.00 in management fees from Duke and King. Complaint, ¶ 79. The balance of the contractually-obligated amount for the period (which would have been a total of $1,041,667.00, Complaint, ¶ 80) was the basis for the claim that the Debtors scheduled for the Kinderhook entity-defendants for their bankruptcy filings (in the amount of $687,500.00). Complaint, ¶ 81.

16. "[F]rom the closing proceeds" of Duke and King's purchase of the Nath Defendants' restaurants, the Kinderhook entity-defendants also received $400,000.00 (denominated as a "transaction fee") and $203,882.00 (denominated as reimbursement of their legal fees and costs for the purchase). Complaint, ¶ 82. Before the date of the closing, the Kinderhook entity-defendants and Duke and King had had no written agreement providing for the "transaction fee." Complaint, ¶ 83. The undertaking for the transaction fee was documented in a one-page letter agreement dated and executed on the date of the closing. *Id*. The Kinderhook entity-defendants procured this arrangement and the payments on it through their control of the Board of Directors of Duke and King. Complaint, ¶ 84.

17. Duke and King made a later (March 1, 2007) purchase of 24 additional Burger King restaurant locations in Missouri from a group of sellers headed by Swisshelm Group, Inc. Complaint, ¶ 102. The Kinderhook entity-defendants received another "transaction fee" of $150,000.00 and

Defendants Cifelli and Head received "transaction fees" of $150,000.00 and $50,000.00, respectively, out of monies disbursed at the closing. Complaint, ¶ 105. There were no written agreements at all to document an obligation for these fees in Duke and King. Complaint, ¶ 106. The Kinderhook entity-defendants used their control of the Board of Directors of Duke and King to procure these payments. Complaint, ¶ 107. Cifelli was then "one of [the] principals" of the Kinderhook entity-defendants. *Id.*

18.    When the Kinderhook entity-defendants caused Duke and King to incur liability for management fees, and when they caused Duke and King to pay themselves, Cifelli, and Head the management fees and the transaction fees, "both Duke [and King] and [the] Kinderhook [Defendants] knew that Duke [and King] was insolvent or was to be rendered insolvent by the Nath Transaction," in various senses of the concept. Complaint, ¶¶ 4, 157-158, 161-162, 168-170.

19.    By mid-December, 2006, Duke and King's Board was aware that Duke and King's "initial post-transaction financial projections confirmed [the] insolvency" that had resulted from the actual state of affairs:   the true magnitude of the restaurants' obligations for operating and CAPEX expenses; the actual operating revenue shortfall below the Flame and Crowe Reports' projections for the same periods; the debt service on the $17.2 million loan from the Bank of America that partly financed the purchase; and the stressor of tightened credit terms for inventory purchases. Complaint, ¶¶ 5, 60-67. The Board's response, "directed by Kinderhook," was to "demand[ ]" the preparation of "a new budget . . . that assumed more optimistic revenue and lower expense projections based on alleged savings and efficiencies that [the] Kinderhook [Defendants] could bring to the portfolio." Complaint, ¶ 6. Even with that, the revised budget issued in January, 2007 showed profitability for 2007 "substantially lower than [the] Kinderhook [Defendants] believed would be the case when it [sic] closed the transaction a mere two months prior." *Id.*

20.    Leading into the closing on the purchase, Duke and King had planned to sell the 12 Florida-based restaurant locations it was purchasing from the Nath Defendants "to obtain [$8 million] cash to support its operation of the remaining" restaurants. Complaint, ¶ 73. It had negotiated a sale to a specific buyer. *Id.* However, that transaction failed because Duke and King had not obtained the Burger King Corporation's approval of the sale as required under its franchise agreements, "before or after closing the [purchase

from the] Nath" entities.  Complaint, ¶ 75.  Duke and King later was able to find two other buyers for the Florida locations, but the separate sale transactions generated only $5.35 million.  "As a result of these transactions Duke [and King] wrote down $5.8 million, or over 33%, of the goodwill it attributed to the [entire] Nath" purchase.  Complaint, ¶ 75.

21.    As "evidenced by" this early write-down, the $15.5 million in goodwill scheduled on Duke and King's first balance sheet, reflecting its position immediately after the acquisition from the Nath Defendants, "[i]n reality . . . had little to no value." Complaint, ¶ 91.  When the $15.5 million in goodwill is deleted from that first balance sheet, it eliminates the $11.2 million in shareholder equity otherwise shown.

22.    In the year following the purchase, Duke and King wrote down $1.3 million from the $13.9 million value stated initially for its property and equipment.  Complaint, ¶ 93.  This reflected how Duke and King "overstated the fair market value of its property and equipment at the time of the Nath" purchase.  *Id.*

23.    Finally, Duke and King's failure at the inception of its operations to book the assumed responsibility for the soon-maturing CAPEX obligations ($9.8 million to $12 million) further refutes the semblance of solvency in its opening balance sheet.  Complaint, ¶ 95.

24.    As Kaye characterizes it, the cumulation of these early reductions of valuations recited in the opening balance sheet shows that Duke and King's "liabilities, at fair value, far exceeded its assets as of the close of the Nath" purchase, making Duke and King "insolvent" from the inception of its business operations.  Complaint, ¶ 97.

Finally, Kaye pleads several fact allegations regarding the actions and knowledge of "Duke [and King]'s Directors" at the time Duke and King closed on the purchase of the Nath Defendants' restaurant locations.[11]  In sum, he faults those individuals for even making the purchase, on the ground that they "knew or, alternatively, should have known" that Duke and King "was insolvent at the time the Nath Transaction closed."  Complaint, ¶ 108.  In particular, he pleads

---

[11]The director-status of the individual Kinderhook Defendants is set forth at ¶¶ 35-38 of the complaint.  *See also* n.16 *infra*.

the following:

25.   Members of Duke and King's Board "knew, or should have known" a true state of affairs that rendered Duke and King's post-purchase operations unsustainable due to all of the existing and impending impediments to profitability. Complaint, ¶¶ 109-113.

26.   Duke and King's "Directors, and Kinderhook, which controlled Duke [and King's] Board" erroneously pursued and made the Nath purchase at a price "that made Duke [and King] insolvent from the time of the Nath Transaction or made insolvency the only possible result from the Nath Transaction." Complaint, ¶ 115.

### B. Framing of Substantive Theories of Recovery

The lengthy allegations of historical fact are asserted as the basis for three broader legal theories of recovery.

### 1. Fraudulent Transfer

The first is an invocation of the statutory remedies for fraudulent transfer--here, Minnesota's enactment of the Uniform Fraudulent Transfer Act, Minn. Stat. §§ 513.41 - 513.51 ("MUFTA") or, in the alternative, New York's Fraudulent Conveyance Act.[12] These statutory claims are pleaded in Counts I and II (as to the Nath Defendants) and Counts III through VI (as to the Kinderhook Defendants).

At the outset, it is crucial to note a fundamental aspect of the form of relief sought here: the functional means for redressing fraudulent transfers under statute is *avoidance*, i.e., the reversal of the legal consequence of specific past, effected transfers of money or property.   *In re Ozark Rest. Equip. Co., Inc.*, 816 F.2d 1222, 1229 (8th Cir. 1987) (terming essence of avoidance remedy "invalidating of a transfer of interest").

---

[12]The complaint's only formal citation to New York law is "the New York Fraudulent Conveyance Act, Sections 273 *et seq.*"  Complaint at 6, 25, 28, 31.  The citation to the codification is N.Y. Deb. & Cred. Law §§ 270-281.  Apparently, the governance of New York law is pleaded in the alternative because two of the Kinderhook individual defendants are alleged to be residents of New York and the Kinderhook entity-defendants are alleged to maintain their principal places of business in New York.

As to the Nath Defendants, the complaint identifies the targeted transfer as the payment of the monetary consideration for the Debtors' initial purchase of the 88-plus restaurant locations:

> The funds paid to [the Nath Defendants] pursuant to the Nath Transaction[13] are transfers within the meaning of [MUFTA] . . . and the New York Fraudulent Conveyance Act.[14]

Complaint, ¶¶ 120 and 130.  There are two further allegations with direct legal significance:

> Duke [and King] did not receive reasonably equivalent value for the transfers to [the Nath Defendants] because the consideration paid for the assets (including assumption of liabilities) far exceeded the fair market value of the assets transferred was exceeded by at least $5 million,[15] and Duke [and King] received little, if any, tangible benefit from the transfer[,]

Complaint, ¶¶ 122 and 131; and "[a]t the time of the Nath Transaction" Duke and King was insolvent in the operational and balance-sheet senses of applicable law, or became so by the payment of the purchase price, Complaint, ¶¶ 123-124 and 131-134.  On those statements, Kaye summarily pronounces

> [t]he transfer to [the Nath Defendants as] . . . voidable as an actual fraudulent conveyance or, in the alternative, as a constructive fraudulent conveyance in violation of

MUFTA and the New York Fraudulent Conveyance Act, Complaint, ¶¶ 125 and 135.  As Kaye would have it, the full purchase price would then be recoverable from the Nath Defendants pursuant

---

[13]By "the Nath Transaction," Kaye apparently means the purchase of the 89 (88) restaurants from the Nath Defendants.  The capitalized term first appears in ¶ 72 of his complaint, right after a recitation of the sale closing on October 31, 2006, where the sale is termed "the transaction."  However, he never gives a definition of the phrase, "the Nath Transaction," by means of a parenthetical.

[14]It may only be a matter of grammatical clunkiness, but this sentence lacks sense.  The funds were the *subject of* a transfer; they were not the transfer (act of passage) itself.

[15]The dual presence of the verb "exceeded" is exactly per the complaint's text.  The meaning is clear enough, but the uncorrected syntax is sloppy.

to 11 U.S.C. § 550.  Complaint, ¶¶ 126 and 136.

As to the Kinderhook Defendants, the complaint identifies as targeted transfers the payment of two types of "fees" to them:  the "transaction fees" paid on the closings of Duke and King's purchases from the Nath Defendants and the Swisshelm parties, Complaint, ¶¶ 138 and 148; and the management fees paid pursuant to the MSA, at or after the closing of Duke and King's purchase from the Nath Defendants, Complaint, ¶¶ 155, 159, and 167.  On similar allegations of contemporaneous, resultant, or subsequent insolvency, operational or balance-sheet in character, Kaye seeks to have these payments avoided under MUFTA or the New York Fraudulent Conveyance Act, as both actively- and constructively-fraudulent, Complaint, ¶¶ 144, 152, 163, and 171; and similarly recoverable after avoidance via 11 U.S.C. § 550, Complaint, ¶¶ 145, 153, 164, and 172.

## 2.  Breach of Duty, Fiduciary and Otherwise

Kaye's second theory of recovery runs against the Kinderhook Defendants who are natural persons (the Michaleks, Aurelio, and Cifelli).  It is pleaded in Counts VIII and IX.

Through these counts, Kaye seeks an award of damages against these persons in consequence of actions they took as officers and directors of Duke and King.  The assertion is that they breached duties in the performance of those acts, to the detriment of the creditors of Duke and King.  Delaware law is invoked as the substantive rule, apparently on the earlier assertion that "Duke is [sic] a Delaware corporation with its principal place of business in Burnsville, Minnesota." Complaint, ¶ 21.

Kaye acknowledges that the four individuals' tenure as officers and directors varied among them.[16]   The central assertion of Kaye's pleading is that "at all times relevant to [his]

---

[16]Three of them (the Michaliks and Aurelio) are alleged to have held their capacities during times when the Board "authorized Duke to enter into the Nath Transaction." Complaint, ¶ 183. Cifelli is alleged to have joined the Board "[u]pon consummation of the Nath Transaction," at the same time he was "a Director or Managing Director of Kinderhook."  Complaint, ¶ 184.  Robert Michalik is alleged to have

Complaint, three Kinderhook principals were Directors of Duke," and "through these Directors, [Kinderhook] had sufficient votes to control Duke's Board."  Complaint, ¶ 187.

These individuals' acts as board members are impugned as breaches of a fiduciary duty of loyalty, committed in the board's actions to authorize various corporate transfers and undertakings.  This fiduciary duty is alleged to have run to both Duke and King *and* to its creditors. Complaint, ¶¶ 181, 182, 190, 193, 195, 196.

The acts by Duke and King are identified as the payment of the initial "transaction fees" to the Kinderhook entity-defendants and Cifelli, Complaint, ¶¶ 188-189; the entry into the MSA with its provision for payment of substantial ongoing management fees to the Kinderhook entity-defendants, Complaint, ¶¶ 191 and 193; and Duke and King's issuance of promissory notes in a total face amount of $2,125,000.00 to the Kinderhook entity-defendants in exchange for cash infusions into Duke and King made after corporate formation, Complaint, ¶¶ 194-195.

The trigger of the duty is identified as Duke and King's contemporaneous insolvency and its operation on unreasonably small capital.  Complaint, ¶¶ 190, 193, 194.  The acts of the board members are characterized as "conduct that amounts to self-dealing."  Complaint, ¶ 182. This would be the precipitant of liability as pleaded.  As damages, Kaye seeks a recovery in the amount of the fees actually paid.  He also seeks an award of damages, in an amount equal to the still-unpaid balances of principal and interest under the MSA and the promissory notes.  Complaint, ¶ 196.[17]

---

been a member of the Board "at least through the closing of the Nath Transaction, and may have remained on the Board following the transaction."  Complaint, ¶ 185.

[17]It is not clear how the existence of an unsatisfied liability owing by a company liquidated in bankruptcy directly translates to an entitlement to damages in anyone, as Kaye seems to be asserting.

Separately, Kaye pleads a claim against the same four defendants for breach of a duty of care in their capacity as members of Duke and King's board.[18]  This essentially sounds in negligence.  In sum, he alleges that they were derelict in proceeding with the purchase from the Nath Defendants, on the agreed price and with the particular capitalization of Duke and King that they arranged to enable the purchase and the commencement of business operations.

Kaye assigns the status of "Kinderhook insiders" to the four individuals.  Complaint, ¶ 201.  He pleads that the Flame and Crowe Reports gave the Kinderhook individual defendants knowledge and notice of multiple shortfalls and defects in the Nath restaurants' past performance, their liquidity, and their future profitability and viability.  Complaint, ¶¶ 202.a. - e.  He also attributes knowledge or notice to the four, that the obligations for the transaction and management fees would have "immediate," and "materially negative," "impact on Duke's liquidity."  Complaint, ¶ 202.f. - g.  He alleges that the four had knowledge or notice from the two reports

> that the structure of the Nath Transaction created an operating entity that was insolvent as a result of the transaction and remained insolvent following the transaction,

Complaint, ¶ 202.h., and that they "ignored multiple red flags about the likely financial demise of the Duke enterprise as structured through the Nath Transaction . . . ," Complaint, ¶ 203.  Characterizing the actions of the four Kinderhook individual defendants as "grossly negligent in approving the Nath Transaction and the payment of transaction fees and management fees," Complaint, ¶ 204, he summarily demands an award of damages for that negligence "in an amount not less than $28 million," Complaint, ¶ 206.

### 3.  Adjustment of Claims in Bankruptcy Case: Recharacterization, Disallowance, Subordination

Substantively, the two remaining counts of Kaye's complaint fall into a third category.

---

[18]At least in the wording of the title of Count IX, this duty is also characterized as a fiduciary duty.

The relief would activate in Kaye's further administration of the liquidating trust; and it would alter the status of the Nath Defendants and the Kinderhook Defendants as actual or potential claimants entitled to share in further distributions from the trust.

Both the Nath Defendants and the Kinderhook Defendants have claims of record in the underlying bankruptcy cases; the Nath Defendants filed proofs of claim and the Debtors scheduled claims for Kinderhook entities when they filed under Chapter 11.[19]  Count VII goes to the claims of the Kinderhook entity-defendants alone.  Count X goes to all of the defendants.

On his cumulated, prior, and general pleading of fact, Kaye characterizes the Kinderhook entity-defendants' claims in the bankruptcy case as "the claim of an insider with a controlling interest in Duke, as equity, as management, and through its control of Duke's Board of Directors," Complaint, ¶ 176, which "arose while Duke was insolvent and operating with unreasonably small capital," Complaint, ¶ 177.  Thus, as Kaye would have it, "[i]n fairness and equity to the estate's general unsecured creditors, the Kinderhook claim should be recharacterized as equity."  Complaint, ¶ 178.[20]  In the alternative, he demands that the Kinderhook entity-defendants' claims be equitably subordinated "to the claims of the estate's general unsecured creditors" pursuant to 11 U.S.C. § 510(c).  Complaint, ¶¶ 174, 179.

In Count X, Kaye seeks to have all of the defendants' current or potential claims readjusted for the further administration of assets through the liquidating trust.  This request is prospective in orientation, going to the possibility that Kaye will obtain judgment against any or all of the defendants on the merits of his other pleaded claims.  Looking to the filed claims of the Nath and the Kinderhook Defendants, Kaye seeks to have all such claims disallowed pending their

---

[19]Because the Debtors did not schedule the claims as contingent, unliquidated, or disputed, this gave rise to claims deemed to be supported by prima facie evidence as to their validity and amount.  It also relieved the Kinderhook entities of the obligation under 11 U.S.C. § 502(a) to file a proof of claim in order to obtain a claim deemed to be allowed.  Fed. R. Bankr. P. 3003(b)(1).

[20]Kaye does not identify the forum state that would furnish the legal governance for such relief.

"return[ of] such avoidable transfers to the estate," pursuant to 11 U.S.C. § 502(d).  Complaint,

¶ 210.[21]  But then Kaye stacks on a summary invocation of § 510(c) as to any claim that might be

asserted in bankruptcy by any defendant other than the Kinderhook Defendants, "to the extent that

any other defendant in this action is found to have a claim against the estate . . . ."  Complaint,

¶ 212.  Finally, he seeks to have the claim of any defendant ultimately adjudged liable in this

adversary proceeding, disallowed pursuant to 11 U.S.C. § 502(d)--that is, until it has "paid the

amount . . . for which such entity is [adjudged] liable," per that statute.

## II.  ANALYSIS OF MOTIONS

Both of these motions for dismissal use the same organization.  Both cast their

arguments on the same two sets of broad considerations, properly framed under Rule 12(b)(6):  the

statute of limitations and the adequacy of Kaye's fact-pleading.  Kaye's claims differ between the

two groupings, in substance and in their triggering factual bases.  Thus the discussion must be split

out to focus separately on each theory for dismissal.  Nonetheless, there is an overlap as to certain

fundamental premises, that allows the clearing of some issues in tandem and with relatively little

discussion.

### A.  Statute of Limitations

The Nath Defendants argue that Kaye's suit against them is barred in full by all

statutes of limitation that may apply, and hence dismissal is merited now.  The Kinderhook

Defendants seek dismissal on time-barring on much the same structure of argument, for the counts

against them that are premised on fraudulent-transfer law.  The Kinderhook Defendants

acknowledge that the statute of limitations does not bar every last component of Kaye's fraudulent-

transfer claims against them.

---

[21]The pleading in this count focuses on the prospect of judgment under Kaye's actions for
avoidance under Chapter 5 against all of the defendants.  Complaint, ¶ 209.  Kaye glosses over his
separately-pleaded claims for damages under nonbankruptcy law.

Kaye's other claims for damages against the Kinderhook Defendants are made under more and different legal theories than that, so the statute-of-limitations analysis for them is more involved. First, however, the treatment as to the substantive centerpiece of Kaye's suit against both groups of defendants:

### 1. As to Kaye's Action for Avoidance on the Theory of Fraudulent Transfer, under Minnesota and New York Law (Counts I - VI)

As to both groups of defendants, Kaye seeks to avoid and recover payments that Duke and King made to them as it consummated its acquisition of restaurant operations, or through later transfers made on agreements related to the acquisitions. Kaye pleaded the substantive legal basis in the alternative; he invoked MUFTA and New York fraudulent conveyance law and sought relief under whichever state's law applied.

Both groups of defendants moved for dismissal of these counts as time-barred. They argued that Kaye commenced suit too long after the dates on which the challenged transfers were made, after the end of the base limitations periods that apply under both states' fraudulent-transfer statutes.

The argument was as follows. Kaye filed the complaint in this adversary proceeding on December 3, 2012. Whether Minnesota or New York law applies, the minimum limitations period is six years from the date of the challenged transfer. Kaye would be entitled that without doubt, as a window of vulnerability to avoidance.

This much of the argument is not in controversy, and can not be. *In re Petters Co., Inc.*, 494 B.R. 413, 422 (Bankr. D. Minn. 2013) (whichever variant of Minnesota's general statute of limitations applies to MUFTA--Subd. 1(2) or Subd. 1(6) of Minn. Stat. § 541.05--"there is the same basic six-year window for the commencement of suit . . . ."); N.Y. C.P.L.R. § 213(8).

The defense argument went on, however. It ran like this: dating that six-year period back from December 3, 2012 (the commencement of suit here), any statutory right of avoidance

21

was outlawed for transfers made before December 3, 2006, at least in application of the basic six-year period. Because the bulk of the transfers in question took place contemporaneously with the acquisition of the Nath restaurants on October 31, 2006, all claims of fraudulent transfer based on them were put to repose six years after that date--on October 31, 2012. Thus, the argument goes, Kaye commenced suit too late. The only escape from that outcome would lie under a "discovery allowance," the statutory measure that defers the accrual of a cause of action for fraud until the plaintiff discovers the previously-secreted factual grounds for the claim. *E.g.*, *In re Petters Co., Inc.*, 494 B.R. at 422. But because Kaye did not plead any facts going to a discovery allowance, and did not even invoke one in his pleading of law, the six-year limitations period of both states' law applies strictly and Kaye's fraudulent-transfer action had to be dismissed against both defendants as to all transfers that Duke and King made before December 3, 2006.

This would have required a full dismissal as to the Nath Defendants, and dismissal as to the Kinderhook Defendants as to the "transaction fee" paid at closing on the acquisition from Nath and any periodic "management fees" paid before December 3, 2006.

That was the movants' argument. Kaye's response was that this lawsuit was brought in a bankruptcy case, and bankruptcy law--specifically 11 U.S.C. § 546(a)--gave him the benefit of an additional two-year period for commencement of suit on any avoidance cause of action that could have been timely commenced by any of Duke and King's creditors on the date of Duke and King's bankruptcy filings.

The parties briefed this issue before it was treated in another group of cases pending in this court, where MUFTA was applied to a massive docket of avoidance litigation in which the dates of putatively-fraudulent transfers ranged over a two-decade period. *In re Petters Co., Inc.*, 494 B.R. 413. The issue at bar--the interaction of § 546(a) and the state limitations law applicable to fraudulent transfer remedies--was presented there, among a half-dozen weighty issues relating to timeliness of suit.

Without on-point, binding precedent, the problem required an analysis down to the statutory basics of the Bankruptcy Code.[22]   On that, 494 B.R. 440-441, the outcome was clear: where a trustee in bankruptcy commences an action for avoidance under 11 U.S.C. § 544 by the deadline of § 546(a)(1), his avoidance power can reach, at minimum, transfers that took place within the full base limitations period under the incorporated state law, dating back from the date of the bankruptcy filing of the debtor in question.  494 B.R. at 441.

Duke and King's confirmed plan preserved the prerogatives of a statutory trustee for Kaye's exercise in his avoidance litigation.  Of necessity, this includes the benefit of § 546(a) under the construction adopted in *Petters Co., Inc.*  Thus, Kaye timely commenced suit as to all transfers by Duke and King going six years back from December 4, 2010.  Because all of the transfers from Duke and King to either grouping of the defendants in this matter took place within that six-year base period, Kaye's fraudulent transfer claims were timely commenced either under Minnesota or New York law.  Counts I - VI of Kaye's complaint are not subject to dismissal as time-barred.[23]

## 2.  As to Kaye's Action for Breach of Duty under Delaware Law
### (Counts VIII and IX)

Kaye sued the individual persons among the Kinderhook Defendants for breach of duty as officers and directors of Duke and King.  He expressly relied on Delaware law for substantive governance.  Complaint, ¶¶ 181, 182, 199, 200.  This, apparently, is premised on the incorporation or formation in Delaware of the business entities within Duke and King.

The Kinderhook individual defendants moved to dismiss these counts as barred by

---

[22]This was also required because cited rulings from the United States Bankruptcy Court for the Southern District of New York, oft-invoked across the country for the position of trustees in recent years, were far too conclusory in their rationale.  494 B.R. at 439.

[23]All of the transfers occurred within the six-year base period.  Thus, it was not necessary to get into the availability of a discovery allowance under either state's law.  The current conundrum under Minnesota law, created by the partial difference in outcome between *Petters Co., Inc.*, 494 B.R. at 421-436, and *Finn v. Alliance Bank*, 838 N.W.2d 585 (Minn. Ct. App. 2013), *rev. gtd.* (Minn. Nov. 12, 2013), is not presented here.

the running of the statute of limitations.[24]  As the basis, they pointed out three things:

> 1.  All but one of the acts alleged to be in breach of a fiduciary duty of loyalty under Count VIII took place more than three years before Kaye commenced suit against them.  (The only exception would be the execution of the May 27, 2010 promissory note for the Kinderhook Defendants' cash infusion into Duke and King.)

> 2.  Kaye's claim in Count IX for breach of a fiduciary duty of care is pleaded solely on decisions made by them at the time of Duke and King's acquisition from the Nath Defendants, or on transfers of fees made later but on contractual commitments formed in connection with that acquisition.

> 3.  But for the execution of the 2010 promissory note, the relevant acts and events took place in their entirety, more than three years before Kaye commenced suit.

The Kinderhook individual defendants insisted that Kaye's reliance on Delaware substantive law bound him to accept the governance of the Delaware law of limitations.  So, they invoked the three-year limitations period that Delaware law imposes on all claims for breach of

---

[24]The statute of limitations is classified as an affirmative defense, necessarily asserted in response to a plaintiff's pleaded claims.  As a result, the burden of raising the statute in the first instance is assigned to the defense, for inclusion in a responsive pleading.  Fed. R. Civ. P. 8(c), *as incorporated by* Fed. R. Bankr. P. 7008(a).  A plaintiff is not required to preemptively plead the absence of factual grounds for every possible affirmative defense.  *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 n.10 (8th Cir. 2009) ("To the contrary, a plaintiff need not plead facts responsive to an affirmative defense before it is raised." (citation omitted)).  *See also Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012) (explaining "A statute of limitations provides an affirmative defense, and a plaintiff is not required to plead facts in the complaint to anticipate and defeat affirmative defenses.").  The courts do allow defendants to assert the running of the statute of limitations in a motion for dismissal brought in lieu of responsive pleading by answer.  *E.g.*, *Wycoff v. Menke*, 773 F.2d 983, 984-985 (8th Cir. 1985); *R. W. Murray Co. v. Shatterproof Glass Corp.*, 697 F.2d 818, 821 (8th Cir. 1983).  However, the merits of a specific limitations defense can be reached by this tactic only where the plaintiff itself has pleaded facts that would trigger the defense, i.e., where the complaint itself (assuming the truth of expressly-pleaded facts) shows on its face that the applicable limitations period has passed.  *R. W. Murray Co.*, 697 F.2d at 821; *Guy v. Swift & Co.*, 612 F.2d 383, 385 (8th Cir. 1980).  If in response the plaintiff proffers an alternate basis in fact and/or law, capable of pleading by amendment, that would override the original factual grounds for time-barring, dismissal should not be granted on a motion under Rule 12(b)(6).  The amendment should be allowed and the new theory tested on its merits.

fiduciary duty.  Delaware Code Title 10, § 8106.[25]  Thus, they said, dismissal of Counts VIII (at least

in part) and IX (in whole) was warranted on the face of Kaye's complaint.  This argument is well-

founded on the state law of this forum.  Minn. Stat. § 541.31, Subd. 1(a)(1) would require the

application of the three-year Delaware statute of limitations.[26]

Kaye responded that Minnesota limitations law (with its general six-year period)

applies, notwithstanding his reliance on Delaware substantive law.  He invoked Minnesota's

"borrowing statute," Minn. Stat. § 541.31, Subd. 2, a part of the local enactment of the Uniform

Conflict of Laws–Limitations Act.  This statute provides:

> Subd. 2.  Action arising out of state; resident plaintiff.
>
> > If a cause of action arises outside of this state and
> > the action is barred under the applicable statute of
> > limitations of the place where it arose, the action may
> > be maintained in this state if the plaintiff is a resident
> > of this state who has owned the cause of action since
> > it accrued and the cause of action is not barred under
> > the applicable statute of limitations of this state.

---

[25]Subject to exceptions not relevant here, this statute provides in pertinent part:

> (a) No action . . . based on a detailed statement of the mutual demands in
> the nature of debit and credit between parties arising out of contractual or
> fiduciary relations, no action based on a promise, no action based on a
> statute, and no action to recover damages caused by an injury
> unaccompanied with force or resulting indirectly from the act of the
> defendant shall be brought after the expiration of 3 years from the
> accruing of the cause of such action . . . .

This limitations period has been recognized in the District of Minnesota.  *Lagermeier v. Boston Scientific Corp.*, 2011 WL 2912642, *8 (D. Minn. July 19, 2011).  *See also Medtronic Vascular, Inc. v. Advanced Cardiovascular Systs., Inc.*, 2005 WL 46553, *4 (D. Del. Jan. 5, 2005) (applying § 8106 to claims for unjust enrichment and fraud); *Crowhorn v. Nationwide Mut. Ins. Co.*, 2002 WL 1767529, *5 (Del. Super. Ct. July 10, 2002) (applying § 8106 to claim for bad faith).

[26]Minn. Stat. § 541.31, Subd. 1(a)(1) provides, in pertinent part:

> (a) Except as provided by subdivision 2 . . . , if a claim is substantively
> based:
>
> > (1) upon the law of one other state, the limitation period
> > of that state applies . . . .

Kaye never acknowledged it, but this new position is an attempt to end-run what indeed would be an end-of-story moment for most of his case on Counts VIII and IX.

Kaye was not barred from taking this tack; but once raised, the argument is not an easy issue to address on a motion for dismissal under *Twombly* and *Iqbal*. That is because the original text of Kaye's complaint appears to have been composed without any thought at all toward a statute of limitations.[27] And once Kaye raised the alternative, both sides argued over the surface of the complaint's blanks as to the germane facts. They never quite got down to the relevant substance whether pleaded or not.

In light of that, these counts could be dismissed out of hand on the complaint's shortcomings. The face of the complaint did trigger Subd. 1(a)(1) and only that, and Delaware's three-year statute would have decisive effect. Or, the whole question could be shunted aside for now by summarily directing repleading, on Kaye's belated invocation of an alternate limitations period.

However, some discussion is warranted. The issue is now out in the open, thanks to the parry-and-riposte between the parties that began with the Kinderhook Defendants' motion. Laying out some analysis will at least narrow and channel the issues going forward.

A first subsidiary issue goes to the initial prerequisite for Subd. 2's exception, that the "cause of action arise[ ] outside of" Minnesota. The complaint says nothing about this. The parties do not cite either law or possible fact that would go to it.

The issue of *where* a cause of action "arises" may be an issue of law, or an issue of mixed fact and law. Here, one could characterize any issue on the liability of the directors or officers of a Delaware-incorporated business entity as "arising" under Delaware law, and hence

---

[27]Kaye's complaint lacks any fact-pleading relevant to a limitations period; he does not cite a law of limitations that is applicable to his claims. Kaye invoked the borrowing statute for the first time in his response to the Kinderhook Defendants' motion for dismissal.

arising "outside" Minnesota; after all, the company itself, as a fictive person in the legal abstract, is outside the regulation of the substantive law of Minnesota as to its constitution and its internal relationships.

This legally-oriented construction makes some sense. Now days, corporate officers and directors may be widely-flung in their places of residence and work. So, their acts in making policy and directing management for an artificial entity do not necessarily link as powerfully to the soil of a particular jurisdiction--unlike (for instance) the infliction of injury in an automobile accident or the use of a defective product placed into the marketplace of a particular state. And if a pervasive governance of Delaware law is part of the expectation arising from incorporation there, as it has settled into the bedrock of American business and corporate culture in the 21st century, it is arguable that Delaware's legal governance is to be imposed on all who voluntarily deal in and with Delaware-incorporated entities. This could be a basis to fix the origin-point of Counts VIII and IX in Delaware.

The Kinderhook Defendants supported their argument with that justification in broad policy, but they did not cite legal authority to bind it to an application. And Kaye did not respond to this point at all.

It is hard to believe there is not some case law on the point. But nobody has brought it into the record. It is not appropriate for the court to first articulate the issue and then do the full work of analyzing it in a responsibly thorough way. It is better addressed after more work from the parties. After all, their stances create the issue; and with luck the clash of opposing interests will focus it properly.

If the *physical* situs of decision-making and consequent action on behalf of a corporation does bear on the point of arising for Subd. 2, the plaintiff's fact averments are tangential at best. The various Kinderhook entities are said to be organized under Delaware law, and to have principal places of business in New York, New York. The four individual Kinderhook Defendants

are identified as residents of New York and New Jersey, two and two.  If the physical situs of impugned board deliberations or officer action is decisive or even just relevant, the point is confused by the current, common practice of conducting meetings and communicating individual resolve and collective resolution in the virtual plane through the use of modern communications technology.[28]

Whether this threshold issue under Subd. 2 is factual, legal, or both; and whether the issue has been judicially addressed or settled in application of a non-Delaware borrowing statute in Minnesota or elsewhere, Kaye's complaint is nearly silent.  It needs amendment.

Subd. 2 has a second threshold prerequisite, the *de jure* barring of suit on the cause of action under the limitations law of the place where it arose.  Between the content of Kaye's complaint and the thrust of the Kinderhook Defendants' argument, this prerequisite might be satisfied.  The acts in suit could be deemed to have taken place "in" Delaware, given the lack of physical rootedness for any intangible entity, and the non-physical nature of the acts sued on; or at least they would be deemed to be under the reach of Delaware's legal regulation and none other, and perforce subject to dismissal under Delaware's three-year statute.  But there is a counter-cutting circumstance:  the decisions were given substance and effect through a business entity that maintained offices (alleged to have been management headquarters) in Minnesota.

The current pleading does not say enough about either alternative.  It is not written in the sky that Counts VIII and IX are time-barred under the law of every potential forum, but it certainly is not established that they were timely-sued.  Kaye's complaint is deficient as to this second prerequisite also.

In his current argument, Kaye does address the third requirement of Subd. 2, that

---

[28]Kaye makes much of the decisions having been made "primarily in offices and conference rooms in New York, New York where Kinderhook is located."  Liquidating Trustee's Consolidated Surresponse [Dkt. No. 27], 6.  Apart from its gross assumption of facts without evidence, this blithe little fillip is far too 20th-century.

the invoking plaintiff be a resident of Minnesota. However, his argument rests too much on a misdirected, dated frame of reference, distorted by overreliance on the ethos of bankruptcy. He relies not only on the "headquarter[ing]" of "the corporation" in Burnsville, Minnesota; he also asserts (with no basis in the pleading and no citation to evidence) that the "pool of creditors" in the underlying bankruptcy cases is dominated by "dozens of entities and individuals located or resident in Minnesota." He insists that their residency bears on the issue.[29]

But even with those complications, the status of Minnesota resident is not foreclosed for the plaintiff's interest in this litigation. To reach that issue, the imprecision of Kaye's theory must be ignored, and the true plaintiff with standing must be identified as a threshold matter.

First: as a very technical point, Kaye does not qualify personally, even though he is named at the top of the caption. He states that he is a resident of New York. Complaint, ¶ 22. This would defeat his general position on the residency element.

But (as the ponderous self-identification in his caption keeps reminding us) Kaye is not the named plaintiff in an individual capacity. His individual interests are not being asserted and he sues on behalf of an artificial entity.[30] The current real party in interest as complainant on Counts VIII and IX is the liquidating trust. The issue then is, where does the trust reside?

---

[29]Kayes does not realize the implications of his strong attachment to this thought, for the matter of standing. *Infra* pp. 30-32.

[30]Rule 17 makes it clear that Kaye did not have to formally plead in the Duke and King post-confirmation liquidating trust as a named plaintiff:

(a) Real Party in Interest.

(1) Designation in General. An action must be prosecuted in the name of the real party in interest. The following may sue in their own names without joining the person for whose benefit the action is brought:

. . . .

(E) a trustee of an express trust . . .

Fed. R. Civ. P. 17(a)(1)(E), *as incorporated by* Fed. R. Bankr. P. 7017.

Kaye expressly asserts the trust's right to sue, but he has not articulated a basis for the standing of a party-plaintiff in a consistent fashion. At points, he has asserted a status for the trust, or for himself as its liquidator, as the successor to (and assignee from) Duke and King on these causes of action, by operation of the confirmed plan and the post-confirmation trust agreement. This would presuppose that the causes of action on Counts VIII and IX belonged to the Debtor pre-petition, and passed into the estate by operation of 11 U.S.C. § 541(a).[31]

At other points, Kaye advances a different theory of standing. In briefing, he dwells on how the Debtors' creditors were the "true tort victims here," and how a recovery on Counts VIII and IX would benefit them eventually, outside of bankruptcy. Linking to that thought, he asserts that Delaware law gave creditors themselves a direct right of action against the Kinderhook Defendants. In that connection, he suggests that he has stepped directly into such creditors' standing.[32]

And then in oral argument, there was a third thought. Kaye's counsel stated that 11 U.S.C. § 544(b) gave Kaye "the authority" to sue out Counts VIII and IX.

This confusion showed that Kaye and his lawyers had no attunement to governing local appellate precedent. Under Eighth Circuit jurisprudence, a sharp and outcome-determinative distinction is drawn among three possible sources of trustee standing, based on longstanding Supreme Court precedent. *In re Ozark Rest. Equip. Co., Inc.*, 816 F.2d at 1225. That binding authority requires the identification of the origin and beneficiary of the underlying cause of action, as fixed by Delaware law. When done, this shows a second source of the confusion on Kaye's

---

[31]If this is so, the timeliness of Kaye's commencement of suit within the context of the bankruptcy case would be subject to 11 U.S.C. § 108(a) for Counts VIII and IX, rather than § 546(a). The difference has no practical effect. Section 108(a)(1) extended the applicable limitation period under nonbankruptcy law by the same period of two years after the Debtors' bankruptcy filings, as § 546(a) did for avoidance causes of action that had been available to creditors of Duke and King as of the bankruptcy filings.

[32]Kaye is fond of the metaphor, "in the shoes of." In its connotative vagueness, this says nothing about the legal trajectory of the foot. It is also footsore in its overuse.

part.[33]

So it is best to start at the base, the nature of the cause of action under nonbankruptcy law.

Kaye insists there is a direct right in the creditors of an insolvent Delaware corporation, to sue officers and directors for past breach of their fiduciary duties. Assuming the mantle of a surrogate of such creditors, Kaye insinuates at points that he undertook *on their behalf* to sue the Kinderhook Defendants on such claims, using a right of action that had been available *to them in their individual right* when Duke and King filed for bankruptcy.

Assuming that Kaye has correctly gleaned the nature of the cause of action, this analysis has a fatal gap under the general scheme of bankruptcy law. A statutory trustee in bankruptcy--and hence a successor like a post-confirmation liquidating trustee--does not have authority to "assert general causes of action [against third parties] . . . on behalf of the bankrupt estate's creditors" under 11 U.S.C. § 544 or otherwise. *In re Ozark Rest. Equip. Co., Inc.*, 816 F.2d at 1228 (citing *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972)). From a different angle, § 544(b) is "flavored with the notion of the trustee having the power to avoid 'transfers' of the debtor," 816 F.2d at 1229; but where a pre-petition cause of action available to a debtor's creditors "does not entail [the] invalidating of a transfer of interest, but instead imputes the obligations of one party to another regardless of any 'transfers,'" the facial vesting under § 544(b) of a legal power to "avoid any transfer" does not confer standing on a trustee to seek an award of damages or other judicial relief against a third party even if general creditors could have done so outside of bankruptcy. *Id.*

So, when Kaye argued on the premise of a direct right of action for damages against

---

[33]And this confusion multiplied itself when this threshold question extended into the actual analysis under Minnesota's savings statute. It is not obvious at the outset, but these aspects of the cause of action drives several aspects of the application of Minnesota's borrowing statute.

the Kinderhook Defendants having been available to Duke and King's creditors, he was diametrically off-base in asserting that the bankruptcy estate and then the liquidating trust had succeeded to it.

But in the end, Kaye benefits (paradoxically) from his own error on Delaware law. His gross misperception of standing in bankruptcy does not harm his case either. Kaye cites *North Am. Catholic Educ. Programming Fdn., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007) for the creditor-standing on a direct right of action that he posits. *The opinion actually stands for the opposite proposition of law*:

> Accordingly, we hold that individual *creditors* of an insolvent corporation have *no right to assert direct* claims for breach of fiduciary duty against corporate directors. Creditors may nonetheless protect their interest by bringing derivative claims on behalf of the insolvent corporation or any *other* direct nonfiduciary claim, as discussed earlier in this opinion, that may be available for individual creditors."

930 A.2d at 103 (emphasis in original).

So, Delaware law gave a cause of action of the sort pleaded here, but *to Duke and King* in the first instance. If that cause of action were not pursued, standing would pass *then* to creditors under a derivative status.[34] To the extent it had accrued to Duke and King before the bankruptcy filing, this cause of action passed into the bankruptcy estate (by operation of § 541(a)) and in turn went into the liquidating trust (through the apparatus of the plan and the plan's confirmation and consummation, *see* n. 4). Running as it did to Duke and King under governing substantive law, it may now be sued out by Kaye--in his capacity as an administrator of assets held by the liquidating trust, however, not as an avoidance-armed trustee or as a direct creditor-

---

[34]Delaware law's vesting of derivative standing *in the creditors* of an insolvent corporation undoubtedly rests on the same policy and practicality as shareholder-derivative standing against a corporation, on similar and other claims. When malfeasant directors and officers control any decision to sue, injured parties in privity to the corporation would lack practical redress against such wrongdoers, were they not allowed to sue in the company's right for a recovery to the corporation.

successor or creditor-surrogate.   *Cf. In re Ozark Rest. Equip. Co., Inc.*, 816 F.2d at 1225

(comparing operation of § 541 (and 11 U.S.C. § 704) as to *debtor's* causes of action, versus

nonavailability to trustee and bankruptcy estate of *creditor's* general pre-petition causes of action).

The Eighth Circuit expressly categorizes as such, the very causes of action in suit against the Nath

Defendants:

> [11 U.S.C. §§ 541 (and, in a Chapter 7 case, 704)] give the trustee authority to bring an action for damages on behalf of a debtor corporation against corporate principals for alleged misconduct, mismanagement, or breach of fiduciary duty, because these claims could have been asserted by the debtor corporation, or by its stockholders in a derivative action.

816 F.2d at 1225.

With the liquidating trust identified as the real party in interest as plaintiff, and it being

a successor to the Debtor's status, the issue of residence can be focused on its own substance.

At least two undisputed facts can be gleaned from the record.   First, as noted, Duke and King's

operational headquarters were physically located in Minnesota.[35]   Second, the organic document

for the liquidating trust subjects the trust to the governance of Delaware law.   Duke and King

Corporation Liquidating Trust Agreement (Confirmation Exh. 3.3.1 to Third Amended Joint Chapter

11 Plan of Liquidation [BKY 10-38652, Dkt. No. 464]), ¶ 13.8.[36]   These two circumstances cut at

cross-purposes, and they are not much anyway.   Without further fleshing-out from the parties, it is

prudent not to go any further on this issue.

The Kinderhook individual defendants' argument did not address a possible

---

[35]Hence, the proper basis for the venue of the underlying bankruptcy cases, in the District of Minnesota.   28 U.S.C. § 1408(1).   That venue is not controverted by any party in interest, notwithstanding the abstract situs of incorporation far away in Delaware.

[36]Prior versions of this document, attached to previous versions of the liquidating plan, would have had the Liquidating Trust Agreement construed under Minnesota law.   *See* corresponding exhibits to Dkt. Nos. 347 and 406, BKY 10-38652, ¶¶ 13.54 and 13.8, respectively.   The change was never brought to light pre-confirmation, and the reason for it is obscure.

application of Minnesota's limitations period under the Minnesota borrowing statute.  Kaye's borrowing-based argument was so hasty and blurred that the statute's several components (particularly the residency requirement) cannot be treated on their merits.  The posture of the liquidating trust as plaintiff raises complications in relation to the genesis of the cause of action.  Then there is the borrowing statute's other requirement, that the invoking plaintiff "has owned the cause of action since it accrued"--which raises another potential issue.[37]

The only clear thing is that Kaye's fact-pleading lacks anything going to the requirements of the borrowing statute he belatedly invoked.  The initial complaint pleads only one circumstance relevant to the choice of law on limitations, the substantive governance by the law of a state other than Minnesota.  This, however, was enough to raise an "insuperable bar" to suit, as the Kinderhook Defendants aptly point out.  With Kaye switching to a different (and fact-intensive) theory of limitations, he has an obligation to plead as to the new alternative.  His opponents are entitled to that much notice now, given the presumptive time-barring that Minnesota law imposed from the face of his original pleading.

At this point, Counts VIII and IX will not be dismissed as time-barred.  However, to set up a better platform for the issue now joined, Kaye must affirmatively plead the facts and law on which Counts VIII and IX would still be subject to suit under the Minnesota-granted statute of limitations.  This is to be done via an amended complaint.

### B.  Adequacy of Pleading, as to Transfers and Their Avoidability

The bulk of argument for both motions went to Kaye's fact-pleading on his fraudulent-transfer counts.  In separate challenges, the Nath Defendants and the Kinderhook Defendants categorically deny that Kaye's pleaded facts could support a recovery under the law

---

[37]A conundrum is suggested here by the succession of the right, title, and interest in the causes of action, from Duke and King through the bankruptcy estate to the liquidating trust.  This occurred through the court-sanctioned process of reorganization under Chapter 11.  The question of whether the ownership can be deemed forward seamlessly for the purposes of the borrowing statute is made especially nuanced by the context of bankruptcy and the initial operation of 11 U.S.C. § 541(a).

he invokes.  They flavor their arguments with the concept of plausibility from *Twombly* and *Iqbal*, in its factual sense, and they structure their argument on Rules 8 and 9.  But some of their arguments go to a deeper level:  whether fraudulent transfer law should apply at all to transactions of the sort Kaye seeks to avoid.

In that regard, it is important to remember the identity of the party on which the statutory elements focus: the debtor.  Here, that is Duke and King.

To merit avoidance, Kaye must show that one of the debtor-entities within "Duke and King" made the transfers, and that the assets transferred were the debtor's own property.  11 U.S.C. § 544(b) ("any transfer of an interest of the debtor in property" is subject to avoidance at instance of trustee in bankruptcy).  More pointedly, if a transfer is to be avoided under the rubric of actual fraud, Kaye must prove that the transferring debtor itself harbored the requisite intent to hinder, delay, or defraud, *In re Polaroid Corp.*, 472 B.R. 22, 32 and n.9 (Bankr. D. Minn. 2012) (citing to *Underleak v. Scott*, 117 Minn. 136, 134 N.W. 731, 733 (1912)), *aff'd*, *Ritchie Capital Mgmt., L.L.C. v. Stoebner*, Civ 12-3038, Memorandum Opinion and Order [Dkt. No. 57] (D. Minn. Jan. 6, 2014); and that the transferring debtor specifically directed that intent toward its own creditors, *In re Petters Co., Inc.*, 495 B.R. 887, 907 n.32 (Bankr. D. Minn. 2013) (citing Minn. Stat. § 513.44(a)(1)).

## 1.  Pleading Actual Fraud with Particularity

As a general matter of pleading, a complaint alleging actual fraud must plead "the who, what, when, where, and how" of the perpetration, "the first paragraph of any newspaper story." *Ritchie Capital Mgmt., L.L.C. v. Jeffries*, 653 F.3d 755, 764 (8th Cir. 2011) (citing *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011)) (applying pleading standard of Fed. R. Civ. P. 9(b)).

The essence of an actually-fraudulent transfer is that the transferor-debtor acted, with awareness and intent, to remove the transferred property from the recourse of current or future

creditors that otherwise could look to such assets for satisfaction on their claims against the transferor. Douglas G. Baird and Thomas H. Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 VAND. L. REV. 829, 829-830 (1985) ("The basic prohibition" of fraudulent transfer statutes is that "[a] debtor cannot manipulate his affairs in order to shortchange his creditors and pocket the difference. Those who collude with a debtor in these transactions are not protected either."). *See also In re Polaroid Corp.*, 472 B.R. at 41 n.34 (citing *In re Sholdan*, 217 F.3d 1006, 1010-1011 (8th Cir. 2000)). Kaye has a large problem with matching this essence to the sparse pleading of his actual-fraud theory, to satisfy this pleading requirement. That difficulty is not resolved by any process of inference.

### a. As to the Nath Defendants (Counts I and II)

It is necessary to remember the specific transfer to the Nath Defendants that Kaye seeks to avoid: the payment of money, in the amount of the contractual purchase price, in consideration for the purchase of the 88-odd restaurant locations. *Supra* p. 15. Kaye does identify this with particularity.

A basis for the other statutory element, intent, is not pleaded as pointedly. In Counts I and II, Kaye summarily asserts that the "transfer to [the Nath Defendants] is voidable as an actual fraudulent conveyance." Complaint, ¶¶ 125 and 144. That is all he pleads, period.

Since Duke and King was a collection of artificial entities, the actors to harbor the intent would have to be natural persons: the directors contemporaneously in control of Duke and King. *Cf.*, *In re Polaroid Corp.*, 472 B.R. at 40 (attributing transferor-company with intent harbored by controlling shareholder-principal in connection with transfer subject to avoidance). Kaye makes many allegations that these persons "knew, or should have known" of a contemporaneous insolvency or the near-certainty that insolvency would result from the purchase.[38] Then, it is

---

[38]Per Kaye, the patency is established by various facial aspects of the contractual, debt, and asset structure of the post-purchase enterprise, as the directors set it up. Complaint, ¶¶ 108-114.

alleged, the controlling directors went ahead with the purchase, "ignor[ing] these red flags." Complaint, ¶ 115.

But Kaye never alleges that the directors closed the purchase and made the payment with any specific intent to harm the interests of Duke and King's creditors, "to hinder, delay, or defraud" them--individually or generally, contemporaneous or future.  There is just the generic, legalistic rubber-stamping of the transfer itself, the payment, as an "actual fraudulent conveyance," avoidable under law.

Arguably, this does not even hurdle the low bar that Fed. R. Civ. P. 9(b) sets, for pleading the *intent* of an *act* of fraud.[39]  But in any case, Rule 9(b) required Kaye to "state with particularity the *circumstances* constituting fraud," as to the *act* of payment.  Even giving Kaye the benefit of the doubt on subjective intent, his complaint is fatally deficient as to the *nature* of the fraud he attributes to the payment of the purchase price.

On his bare, transactionally-focused pleading, Kaye's theory for an actually-fraudulent transfer makes sense only with a long inference from the complaint's insinuations of scienter (awareness or notice) and an assumed, bare intent to pay the money.  Kaye may be positing the act of purchase from the Nath Defendants, and the commencement of Duke and King's business operations, as necessary precursors to a later fraudulent misdirection of money away from the creditors of Duke and King.  But more from the face of his pleading, he characterizes the payment itself as a fraudulent misdirection.  But in the end, one can use only the conjectural "may"; read as a whole, these counts are that unclear.

And which creditors does Kaye posit, as the victims, the parties harmed by the impugned transfer?  He never makes that very clear either.

_____

[39]Rule 9(b) is made applicable to adversary proceedings by Fed. R. Bankr. P. 7009.  Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  This is a more lenient standard; but fair notice still requires that a specific "condition of . . . mind" be attributed to a specific person or persons, and linked to the specific events sued upon.  Kaye did not do a bit of that.

At one point, he seems to make it all-inclusive: "The claims of the estate's creditors all arose before or after the transfers." Complaint, ¶ 121.[40]

The mushiness of this pleading raises several concerns, and the other pleaded circumstances lead to only one likely implication.[41]  It is unlikely that there were, and still are, creditors of Duke and King preexisting the purchase from the Nath Defendants that were deprived of asset-recourse contemporaneously with the closing.  Kaye does not allege that Duke and King's debt structure on bankruptcy included unsatisfied claims that arose during the promotional phase of corporate formation.  To all appearances from the pleading, the Duke and King enterprise was a bare start-up at the time of the closing.  Plus, on the question of value transferred, the pleading does not recite that the companies had significant net capitalization from investment, other than possibly the difference between the purchase price for the Nath properties and the amount of the loan from the Bank of America that financed the purchase.  One large creditor's claim arose contemporaneously with the payment to the Nath Defendants, the debt to the Bank of America.  Kaye has never given any indication that he relies on the Bank of America as his predicate creditor for the purposes of standing.[42]

So, Kaye is likely relegated to attacking the transfer to the Nath Defendants from the vantage point of *subsequent* (future) creditors, the trade creditors of Duke and King whose claims arose during post-acquisition operations.  This would dovetail with his strident and oft-reprised accusation that the acquisition itself left Duke and King unsustainably undercapitalized, and hence

---

[40]One is tempted to observe: "That about covers it."

[41]Kaye should have been more decisive than that, given the significance of a predicate creditor to his whole suit on fraudulent transfer.  *See In re Petters Co., Inc.*, 495 B.R. at 895-901.  Neither group of movants here made an issue of Kaye's failure to identify a predicate creditor for his fraudulent-transfer claims; but he sure did not identify one.

[42]If he had done that, it would give him large problems.  The Bank of America held a secured claim when the Debtors filed for bankruptcy, its security having been created via the pledge of assets acquired in the Nath purchase; and it was paid in full during bankruptcy from the proceeds of the Debtors' sales under 11 U.S.C. § 363.

unable to meet its costs of operation. It does not fit so well with Kaye's insinuation that the Nath Defendants are to blame, or with his position that they now should be held to account through avoidance.

From that thought, the real underlying issue emerges: just how could a buyer's payment of a purchase price for a going-concern business be made with a specific intent (in the buyer) to hinder, delay, or defraud the *future* creditors of that going concern (in the hands of the buyer)? Or, more focused, how could it reasonably be said that a buyer could make payment for its acquisition with a specific intent to take those very funds away from the satisfaction of its *future* creditors?

This is where plausibility under the new consideration of *Twombly* and *Iqbal* comes into play. The standard requires logical sense in a factual narrative proffered in a pleading, with the logic to be measured under governing law and in mind of the normal range of human expectations and conduct. Here, the question is: under what real-life circumstances could the statutorily-proscribed intent be given play, in this sort of purchase transaction?

Generally speaking, the promoters and incorporators of a business enterprise intend in actuality to establish and constitute it to succeed. That is simply the way it works in an open-market economy driven by entrepreneurship and funded by the free flow of capital, and the way it usually occurs. This general strategy includes the intention to see that suppliers and other trade creditors get paid from the beginning and throughout. After all, that is necessary to keep an enterprise going.[43]

The only conceivable exception to this set of promoter- and incorporator-intentions would be a deliberate, crafted scheme of predation, characterized by a notion of fraud on credit-extending trade suppliers. Some years back, the credit industry and practitioners of bankruptcy law

---

[43]These observations are entirely permissible. *Iqbal*, 556 U.S. at 679 (evaluating plausibility of a pleading requires court "to draw on its judicial experience and common sense").

began using the vernacular term "bustout" for schemes of this sort.

The ploy is a variant of the "equity-skimming" fraud that periodically infests the rental sector for residential real estate: the acquisition of an income-producing asset in a transaction with high leverage and little equity; the launch of operations; the collection of revenues; the incurring of increasing amounts of debt on an ongoing basis; paying few or no creditors current; the disappearance of the money; and the eventual abandonment of the asset, leaving creditors to recourse against exhausted assets and an empty corporate shell.[44]  This kind of scam can last for a while, but only so long as creditors are successfully blandished or sleep on their rights.  Mostly, a true "bustout" can not and does not last very long.[45]  And, its signs can early and quickly mount: repeated delinquency on invoice payments, termination of supplier relationships, turnover in providers, a search for new victims, and so forth.

That is the only conceivable set of fact allegations in which an acquisition of business assets for commencement of operations might be made with a concomitant intent to commit fraud on future creditors.  The existence of such a scheme would be the only way to link the payment of a purchase price to an underlying malign intent, actionable under fraudulent transfer law.[46]  And even on an allegation of a bustout scheme purveyed by a buyer, it would take some doing to justify imposing the avoidance remedy on the seller--at least without a showing of collusion on the seller's part.

Kaye's fact-pleading against the Nath Defendants on the intent for an actual-fraud theory is almost non-existent.  He does not plead the only conceivable predicate in fact for avoidance of the Nath transaction on the ground of actual fraud: the use of Duke and King's

---

[44]A less elaborate functional definition of the phenomenon can be found at **http://www.merriam-webster.com/dictionary/bustout** (last consulted on Mar. 31, 2014).

[45]One reason why equity-skimming off rental property may last longer is the delay inherent in the mortgage foreclosure process under local law--at least in the absence of an assignment of rents.

[46]Even then, the linkage would only be in terms of bare, "but for" causation.

formation and start-up for a bustout.  He does not plead that it functioned as one after formation. And he pleads nothing on an intent on the part of the promoters, board, or operating management to engage in a bustout.

If anything, the reasonable inferences from the fact-pleading run markedly to the contrary.  They suggest a dogged effort by Duke and King's management, four years long, to hold together, stabilize, and rehabilitate a hampered enterprise using the expedients of the open market--until finally bankruptcy was elected.  Kaye never alleges that anyone intended at any time to run a doomed operation into the ground, in the meantime gulling trade vendors into continuing to supply on credit, and heavily tapping off unencumbered cash in the meantime.  And without an allegation that Duke and King harbored this intent at the time the purchase price was paid to the Nath Defendants, the fact-pleading fails on the notion of an actually-fraudulent transfer effected through that payment.

Kaye did not frame up the only historical phenomenon that could make out a platform for the use of avoidance remedies against the Nath Defendants under the actual-fraud theory.  On the balance of his fact-pleading, it is inconceivable how he could have.  When the Nath Defendants challenged him and skepticism was voiced from the bench, Kaye and his lawyers elided the point. They did not proffer any alternate, unpled scenario that would make sense under an actual-fraud theory.

Given that, a grant of leave to amend would be futile.  No legally-tenable patch-up can be envisioned.  For failure to plead a plausible claim for the avoidance of the payment of the purchase price to the Nath Defendants as an actually-fraudulent transfer, and the failure now to propose a plausible basis in fact for his claim, Counts I and II of Kaye's complaint must be dismissed to that extent.

**b.  As to the Kinderhook Defendants (Counts III - VI)**

As to the Kinderhook Defendants, Kaye characterizes a different series of transfers

41

of money as fraudulent and avoidable. It is the repeated payment of "fees" received by particular Kinderhook Defendants from Duke and King's fisc. These transfers started with the undenominated "transaction fees" extracted at the closing of the Nath purchase, from the initial capitalization funded by the Bank of America and other sources. They continued with similar fees paid on the Swisshelm purchase, and the payment of the "management fees" due periodically during Duke and King's period of operation. *Supra* p. 16. As he did for the Nath transfer, Kaye asserts in conclusory fashion that these payments of fees "are voidable as an [sic] actual fraudulent conveyance." Complaint, ¶¶ 144, 152, 163, 171.

This is just as much a summary, rote recitation of the bare, abstract elements of Kaye's claim under law, as it was against the Nath Defendants. It does not pass muster under Rule 12(b)(6). *E.g.*, *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d at 594. It is just as lacking in specificity for the transfers to the Kinderhook Defendants, as to a specific intent to harm or hamper creditors by taking the money out.

In defending this pleading, Kaye makes much of the fact that these payments all went to "insiders," i.e., persons and entities within the Duke and King organizational and management structure, whom he attributes with decisive control over the making of the disbursements. Complaint, ¶¶ 77, 84, 105, 107, 139, 156, 158; Liquidating Trustee's Opposition to Motions to Dismiss [Dkt. No. 24], 3, 6, 8, 10; Liquidating Trustee's Consolidated Surresponse [Dkt. No. 27], 3. He makes the same repeated thrusts at the Kinderhook individual defendants, that they contemporaneously "knew, or should have known" of Duke and King's insolvency.

In the end, these statements are all that Kaye offers, for his pleading on actual fraudulent intent. Nothing else in his complaint bears on this claim as a matter of fact, in a way that would satisfy a legal standard. There is no specific allegation that would go to the essence of an actually-fraudulent transfer through the vehicle of such payments, i.e., that the Kinderhook Defendants directly intended to take the money away from creditors by disbursing it to themselves.

42

Predictably, in defending the adequacy of these sparsely-pled allegations on actual fraud, Kaye falls back on the alternative to direct proof of intent: the "badges of fraud" avenue on which a court may base a finding of actual intent to hinder, delay, or defraud.  The Eighth Circuit has acknowledged that this approach is valid, in the context of fraudulent transfer litigation brought by trustees in bankruptcy under state or federal statute.  *E.g.*, *Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000); *Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir. 1998); *In re Sherman*, 67 F.3d 1348, 1353-1354 (8th Cir. 1995).  Minnesota's fraudulent transfer statute has its own enumeration of such badges.  Minn. Stat. § 513.44(b); *Citizens State Bank of Hayfield v. Leth*, 450 N.W.2d 923, 927 (Minn. Ct. App. 1990).

Of the dozen-or-so recognized badges, i.e., factual circumstances that cumulatively may evidence fraudulent intent in the analysis of hindsight, Kaye can point to only three from the face of his pleading.

> 1.    The Nath Defendants and the Kinderhook Defendants "were insiders" of Duke and King;
>
> 2.  Duke and King "was insolvent at the time"; and
>
> 3.  "[T]hese transfers were made in the face of a substantial debt (over $10 million in CAPEX expenditures were due, or to become due shortly thereafter)."

Liquidating Trustee's Opposition to Motions to Dismiss [Dkt. No. 24], 8-9.  This, he insists, is enough "at the pleading stage" to support his claim against the Kinderhook Defendants with plausibility.

But, assuming the truth of these recitations--and even the baleful but indistinct overlay of "knew, or should have known"--Kaye does not say enough from which the specific, creditor-targeted statutory intent could be inferred.  The extraction by "insiders" of several hundred thousand dollars from a financially-limping business would be actually fraudulent, were it an incident

43

of a bustout scheme.[47]  But Kaye does not plead that the Kinderhook Defendants started or ran

Duke and King as such a scheme.[48]

Instead, Kaye relies on those three badges alone.  He insists that the low number

does not bar an inference, citing several courts' decisions.  This elides the equivocal character of

the badges he does use, individually and (particularly) in conjunction.  The insider-plus-insolvency

combination would work, if the proffered third element of debt-threat made sense under the

traditional notion of an actually-fraudulent transfer.    But Kaye's offer of the looming CAPEX

obligations as a debt-threat badge is laughable, from a plausibility-structured assessment of the

motivation and causality that this badge contemplates.  Would any reasonable entrepreneur in

comparable circumstances really pull out a substantial sum of money, specifically to avoid

requirements imposed by a franchisor that controlled the future of business operations?  No.

In the end, to use a phrase, Kaye's basis for a badges-based argument "did not

ignite in common" to the inference; it "did not even smolder."  *In re Lumbar*, 446 B.R. 316, 331

(Bankr. D. Minn. 2011), *rev'd in part on other grounds*, 457 B.R. 748 (8th Cir. B.A.P. 2011).  The

pleading of these three points alone has "no overriding logical sense of an intentional scheme

directed at" Duke and King's creditors, that culminated in the payment of the fees.  *Id.*

Without an allegation of a broader creditor-targeted scheme, the pleading of "the

circumstances of the fraud" has to be specific to meet notice pleading requirements and to sustain

a badges-based case in litigation.  In a context like the one pleaded here, this extends even to the

matter of intent.  Where a challenged payment was otherwise made in conformity with a facially-

regular contract, a firm understanding, or a general convention of business, and in execution of a

---

[47]Mulcting the enterprise to one's own gain would be the whole purpose of a bustout.

[48]Actually, there are several pleaded fact allegations that would strongly cut against an ultimate finding to that effect.  The Kinderhook Defendants kept Duke and King in operation for four years.  They made a substantial infusion of cash into the structure a year or more post-formation.  Less than 50% of the full amount of ongoing management fees owing per contractual tenor over the four years was actually paid; the substantial unpaid remainder was the basis for a filed claim against the bankruptcy estate.

transaction involving real assets and real consideration, the pleading of an intent to subvert the nominal purpose of payment, to siphon the value from the claims of creditors, must also be made specifically.[49]

Kaye apparently was not able to plead that, and that pointedly, with a straight face. Even at oral argument his lawyer kept pulling the subject away from a plausible theory on the statutory specific intent, to dwell on the simple, structural circumstances of Duke and King's insolvency, its ostensible patency, and nothing more.

In the end, Kaye's pleading is wholly inadequate under Rules 8 and 9, as to an actually-fraudulent intent that would have motivated the payments to the Kinderhook Defendants. Again, he could not offer any more tenable construct of fact to plead by amendment. As against the Kinderhook Defendants, a grant of leave to amend on this theory would be futile. So to the extent of their theory of an actually-fraudulent transfer, Counts III - VI of Kaye's complaint must be dismissed.

## 2. Pleading Constructive Fraud With Plausibility

On the face of modern statutes, the essence of a constructively-fraudulent transfer is phrased in the mathematical abstract: a transfer by an insolvent debtor made for less than "fair consideration" (per the Uniform Fraudulent Conveyance Act) or for "less than a reasonably equivalent value" (per the Uniform Fraudulent Transfer Act and 11 U.S.C. § 548(a)) is *deemed* fraudulent, and hence avoidable. Baird and Jackson, 38 VAND. L. REV. at 830. "This approach presumes mischief when an insolvent debtor voluntarily transferred property and got nothing or clearly too little in return unless the debtor simply was paying off an antecedent debt." *Id* at 830-831.

However, the intent-neutral statutory articulation of elements makes avoidability as

---

[49]This pronouncement is expressly in mind of the point made by Professors Baird and Jackson in their article, cited *supra* at p. 36.

a constructive fraud look like a per se rule. *Id.* If applied literally, this "may treat some transactions in which a debtor was not trying to hinder, delay, or defraud his creditors as fraudulent conveyances." *Id.* It could reach transfers that have no inherently blameworthy character, that were not intentionally targeted against creditors individually or collectively, on the justification that the later *effect* of the transfer was loss to creditors generally.

The possibility that settled, non-collusive transfers may be undone by a court runs powerfully against keystone assumptions of our legal system's regulation of contractual and financial relationships. *In re Petters Co., Inc.*, 494 B.R. at 419. In application, then, the law of constructively-fraudulent transfer must be applied with clearly-defined principles, when it is invoked against transfers outside the specific, directly-abusive phenomenon originally in mind when the remedy was created. *Id.* The framing of those principles should recognize limits, imposed in mind of the broader, destabilizing consequences of upsetting post-transfer rights and expectations that were seated in good faith in transactions that are not of an inherently-abusive nature. Baird and Jackson, 38 VAND. L. REV. at 831-832.

Neither side invoked these broader considerations, but they are squarely implicated by Kaye's pleading on his theory of constructive fraud. Kaye hammers repeatedly on his lengthy fact-allegations of insolvency; that element is the central (even overriding) theme of his pleading and his defense of its adequacy. But as to the other statutory element, something-for-nothing or at least something-for-too-little, his pleading is much lighter. Kaye first alleges that the terms of sale "caused Duke [and King] to pay an amount for [the] franchises that made [it] insolvent from the time of the Nath transaction." Complaint, ¶ 115. This allegation says nothing concrete as to a lack of reasonably equivalent value, in the absolute or even in the comparative.

After that, the potential satisfaction of the element is to be gleaned from Kaye's allegations that

    . . . the consideration paid for the assets (including

46

> assumption of liabilities) far exceeded the fair market
> value of the assets transferred was exceeded by [sic]
> at least $5 million, and Duke [and King] received little,
> if any, tangible benefit from the transfer *and did not
> receive reasonably equivalent value*,

Complaint, ¶ 122 (emphasis added), or "*fair consideration*," Complaint, ¶ 131 (emphasis added, all

other text identical).

This is all the more that Kaye pleads. He does not allege that the sale closing and

the payment gave the Nath Defendants something-for-*nothing* from Duke and King, in the classic

sort of constructively-fraudulent transfer. He really could not make that allegation. The transaction

was structured as a straightforward asset-purchase of a going-concern business, with substantial

cash consideration. As such, the transfer was not of a nature that would invariably harm the

interests of the transferor's creditors.

At most, Kaye's fact-pleading comes down to one accusation-by-inference: Duke and

King made a bad deal with the Nath Defendants by paying too much, and the Nath Defendants

readily took it and got the better of it. Kaye thinks that the Nath Defendants got something for too

little, and Duke and King got too little for something.

Under Kaye's theory of suit, this is to be amerced as the primal cause of Duke and

King's eventual failure, with its pileup of unsatisfied trade creditors' claims. And that is supposed

to be enough to reverse the whole payment, and to have the liquidating trust recover the full amount

of the purchase price.

Regarding the payment of the various fees to the Kinderhook Defendants, Kaye

pleads:

> 1.  As to the total of $700,000.00 in "transaction
>     fees" received by the Kinderhook Defendants
>     at the closing of the acquisitions from the
>     Nath Defendants and the Swisshelm parties,
>     the payments "were neither made in
>     connection with prior written agreements nor
>     conditioned on the Directors' fulfilling certain

goals in connection with the transactions."
Complaint, ¶¶ 138-139, 148.

2.  Duke and King received "in fact no tangible
    benefit from" the payment of the transaction
    fees. Complaint, ¶¶ 141 and 148. Hence,
    Duke and King "did not receive reasonably
    equivalent value in exchange"; and the
    payments "were made without fair
    consideration." *Id.*

3.  As to the payment of $354,166.67 in
    "management fees" paid to the Kinderhook
    Defendants in 2006-2007, the Kinderhook
    Defendants did not contemporaneously
    "render services to Duke [and King] under the
    MSA . . . that were, at fair value worth" that
    amount. Duke and King "received little or no
    tangible benefit in exchange for the
    management fees." Complaint, ¶¶ 160 and
    167.

4.  Hence, Duke and King "did not receive
    reasonably equivalent value for [the] payment
    of those fees," and "the management fees . . .
    were made [sic] without fair consideration . . .
    ." *Id.*

In conjunction, these allegations do raise the notion of the Kinderhook Defendants

having received something-for-nothing. On that thought, Kaye would avoid the payment of these

fees as the precipitant and exacerbation of Duke and King's insolvency, with the full amount of the

transfers recovered for the liquidating trust.

For the purposes of these motions, the issue is: does this factual content plausibly

plead the basis for avoidance as a contrived shucking of asset value from Duke and King's

ownership to the Nath Defendants and the Kinderhook Defendants, under circumstances that

necessarily and likely would prevent the satisfaction of future trade debt? When a plausibility-

structured analysis is done, the outcome splits--between the groups of defendants, and within one

cluster of claims against one group of defendants.

**a. As to the Nath Defendants (Counts I and II)**

48

At the outset, it is important to note what Kaye has *not* sued out against the Nath Defendants under Counts I and II, by way of legal theory.

Counts I and II are not an action for damages under the common-law theory of fraudulent misrepresentation.   Given everything on which Kaye disparages the Kinderhook Defendants, his insinuations of what they "knew, or should have known" of the pre-sale deficiencies in the restaurants' operation and value, he truly would have an insuperable bar to suit on this cause of action.   He simply could not satisfy the element of reliance for the cause of action for common-law fraud under generally-applicable law.   Under the standard rule, a finding of justifiable reliance can not be made where "the falsity of the representation is known or obvious to the listener . . . ." *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 320-321 (Minn. 2007) (citing *Spiess v. Brandt*, 230 Minn. 246, 253, 41 N.W.2d 561, 566 (1950)).

Nor are Counts I and II a proceeding in equity for rescission, i.e., for a bilateral undoing of the sale with a forced refund of the purchase price.   After the closing of the § 363 sales in the main cases, neither bankruptcy estate nor liquidating trust were in a position to restore the status quo ante on rescission.   They had nothing to return to the Nath Defendants.   *See Liebsch v. Abbott*, 265 Minn. 447, 451, 122 N.W.2d 578, 581 (1963) ("The general rule is that a party who wishes to rescind an agreement must place the opposite party in status quo."); *Knappen v. Freeman*, 47 Minn. 491, 493, 50 N.W. 533, 534 (1891) ("When a party seeks to rescind a contract by his own act, he must give the other party notice of his rescission, and restore or offer to restore to him whatever he received from him under or by reason of the contract.   In other words, he cannot repudiate its obligations and retain its benefits.").   Beyond that, 11 U.S.C. § 363(m) protected the purchasers through the bankruptcy process from divestment.   *In re Trism, Inc.*, 328 F.3d 1003, 1006 (8th Cir. 2003).   So, Kaye could not have called back the assets from them in any case.

In actuality, Kaye invoked a very specialized context-specific remedy, avoidance as fraudulent transfer.   This vehicle for relief is available only where there is a preexisting relationship

of debtor and creditor.  Through it, a debtor's transfer to a third party may be undone--reversed in

legal effect--on proof of statutorily-prescribed elements.[50]   Under the statutory alternative of

constructive fraud, the elements are laid out in deceptively-simple and abstract language.  They are

voiced in terms of structure (balance-sheet insolvency), operational dynamic (operational

insolvency), and their relation in time to the act of transfer (preexisting, contemporaneous with, or

resulting from the act of transfer).  But the key requirement, equally abstract in nature, is proof that

the transferring debtor did not get anything in return for what it transferred, or at least got materially

too little.

In moving for dismissal, the Nath Defendants did not question the unspoken

predicate for Kaye's constructive-fraud theory against them: that the remedy can lie directly against

a seller like them, in favor of a party-plaintiff with standing, if a sale for an excessive price starts a

business operation that is or becomes operationally insolvent.  Nonetheless, this issue is present,

and it is right in the center of things.  As a pervasive predicate, it is properly addressed at the

pleading stage.  And it was appropriate to raise it from the bench at the hearing; in suing out the

theory, Kaye was asking the court as an institution to pry behind the surface of a years-settled

transaction, through a remedy that just did not make sense toward the application sought.

In response, Kaye blandly said throughout that he had pled enough facts that would

satisfy all of the elements of a constructively-fraudulent transfer in more than ample detail, as to the

structure and dynamic of the Nath transactions.  He went back, again and again, to the analysis for

his post-hoc judgment that from the beginning Duke and King's assets had too little value and

insufficient capacity to sustain operations and to satisfy current obligations at any relevant time.

Kaye discounted it in his attentions on these motions, but the gravamen of Counts I and II is that

---

[50]It is only after the invalidation of a transfer--avoidance effected as a matter of law--that a
successful fraudulent-transfer plaintiff in a bankruptcy case may receive the functional equivalent of an
award of damages for the benefit of creditors generally.  Under 11 U.S.C. § 550, this is to be granted
where "the . . . transferred property [itself] cannot be recovered."  *In re Willaert*, 944 F.2d 463, 464 (8th Cir.
1991).

Duke and King paid at least $5 million too much to the Nath Defendants for the restaurant operations.  This, he posited, would be enough with his allegations of insolvency to make out a prima facie case against them for avoidance.  On those allegations alone, he insisted, he must be allowed to proceed in suit against the Nath Defendants.

To be logically plausible under Kaye's chosen theory of suit, his allegation of excessive purchase price must have a realistic, "could have done" alternative--i.e., he had to be able to outline a structure of terms under which an acquisition from the Nath Defendants would have resulted in a solvent and sustainable business operation, which  the Kinderhook Defendants reasonably would have pursued.[51]

Under one conceivable scenario, Duke and King would have borrowed just as much from the Bank of America for purchase; paid significantly less to the Nath Defendants; and then used the surplus from the loan proceeds to cover the ripening CAPEX obligations or to meet the expenses of early operation.  (This might be what Kaye has been driving at, but he does not get to the point of saying it.)  But in such a scenario, the debt service to the Bank of America presumably would have been just as great, leaving Duke and King with the same inflexible ongoing burden. Kaye never pleads a way in which the purchase price could have been pegged low enough to still make it work.

A larger equity infusion from the Kinderhook Defendants might have been another alternative; but in that instance Kaye's present proposal for avoidance would have the Nath Defendants being the goat for the Kinderhook Defendants' misjudgments in not doing that (not to mention the possible improvidence of the Bank of America's lending).

When viewed in this light, there is a patent mismatch of the fraudulent transfer remedy, as Kaye would have it imposed on the Nath Defendants in consequence of Duke and

---

[51]Obviously, this thought has its relevance to Kaye's breach-of-duty claims against the Kinderhook individual defendants also.

King's failure.  This is evidenced at its extreme end:  Kaye seeks to recover not only the alleged excess within the purchase price; he would have the Nath Defendants disgorge the full amount.

In the end, Kaye seeks to have a remedy applied to a transfer made far outside the context of abuse that the remedy is intended to redress.  Two questions are disarmingly simple, and seemingly simple-minded, but they beg to be posed.  Just how is a bad deal in the purchase of the infrastructure for a start-up business defensibly deemed a fraud on the business's future creditors, when there is no allegation of fraud on the part of the seller against either the buyer or the future creditors and when the nature of such a purchase is not intrinsically harmful, fraudulent, or blameworthy, as to creditors generally?  And how just is it to call the *seller* to account for the failure of the buyer to sustain the purchased enterprise, for the benefit of creditors with which the seller was never in contractual privity and to which it was a de facto stranger?

The thrust of Kaye's fact-pleading is that the Nath Defendants as seller got the benefit of a deal that was bad for the fledgling Duke and King as buyer.  But that is all the more that can be laid to the Nath Defendants.  The pleaded facts contain nothing else that would go to the Nath Defendants' culpability for the harm that Duke and King's creditors incurred in its eventual failure, under the particular sensibility of fraudulent transfer law.  And in particular, it is not pleaded that the Nath Defendants received something for nothing, the gratuitous transfer that is the classic example of the wrong addressed by the remedy.

In responding to these motions, Kaye and his lawyers did not cite a single published decision, from the trial or appellate level, which expressly countenances the application of this avoidance remedy to the payment of a purchase price made as pleaded here.  That is no accident.  The constructive-fraud variant of fraudulent-transfer law simply does not fit to a purchase-money transaction that is not alleged to have been collusive between the seller and the purchaser-debtor.

In itself, such a transaction is not "one in which it was likely or even possible that the [purchaser-] debtor intended to hinder, delay, or defraud his creditors," Baird and Jackson, 38 VAND.

52

L. REV. at 831.  An inherent likelihood of creditor-fraudulent intent is not present, even if the price was excessive and the carrying of resultant debt service fatally burdensome to operational solvency, de facto.  Under Kaye's pleading, Duke and King's purchase from the Nath Defendants does have the look of a bad deal.  However, bad deals can be entered without either such party harboring intent predatory toward future creditors; and bad deals made without such intent might be addressed with post-closing expedients like further capital infusion, operational restructuring, and the like.  But whether amelioration is possible or not, a bad deal for a price too high has no automatic resonance with the classic, collusive divestment of assets to a related transferee for little or no consideration--even when the deal is so flawed as to likely end in insolvency and enterprise failure.

Thus, there is no justification for a rote, abstract exploitation of the constructive-fraud theory as a per se basis for avoidance in this situation.  *See* Baird and Jackson, 38 VAND. L. REV. at 831 (suggesting that application of remedies on constructive-fraud theory should be limited to "in cases [of transfers and transactions] in which the chances of fraud are very high," to avoid "costs to society of setting aside legitimate transfers"; elimination under constructive-fraud theory "of costs associated with proving actual fraudulent intent" does not outweigh potential social and economic cost of upsetting transactions outside historical range of fraudulent-conveyance law).

That is a sufficient reason to reject Kaye's theory of suit on his fact-pleading.  However, several of Kaye's own rationalizations for pursuing the Nath Defendants should be addressed in specific.

Kaye defends his use of the constructive-fraud alternative against the Nath Defendants on his allegation that Duke and King's payment of the purchase price harmed all of its creditors,[52] because a deep-rooted structural insolvency necessarily resulted from the terms of purchase.  For an adequacy-of-pleading analysis, one could credit that bare chain of causality--to

---

[52]Here, obviously to be equated with Duke and King's *future* creditors.

the extent of assuming that the flow of cumulated events over the four years after the purchase had

the *effect* of making all of Duke and King's creditors worse off as a group, and it would not have

happened had the Nath purchase not been made in the first place.   But that could be said in

isolation for "many ordinary transfers that a debtor makes."   Baird and Jackson, 38 VAND. L. REV.

at 834.  Justifying avoidance under constructive-fraud theory in redress of such an attenuated harm

would cut the remedy loose from original legislative intent, however, and leave it without principled

limits.  *Id.*

Most likely, Kaye would point to another part of his argument to meet this concern:

his identification of the looming CAPEX obligations for the purchased restaurants, which he offered

as a "badge of fraud" for his separate argument on the actual-fraud alternative.   Liquidating

Trustee's Opposition to Motions for Dismissal [Dkt. No. 24], 8-9.  The use of that isolated

circumstance for that purpose was rather odd, however.  Yes, as a matter of historical coincidence,

the purchase price was paid "in the face of a substantial debt (over $10 million in CAPEX

expenditures were due, or to become due shortly thereafter)," *id.*  But there is no plausibility to the

notion that Duke and King paid the Nath Defendants the purchase price in order to divert its initial

start-up capitalization away from the CAPEX obligations.   (In the absence of a bustout scheme,

what benefit could the Kinderhook Defendants have gotten from such a ploy?)  On the same

thought, the impending reckoning on CAPEX can not plausibly be used to shoehorn the act of

paying the purchase price closer to a traditional creditor-targeted transfer, to make a match to the

remedy.

One other aspect of Kaye's pleading illustrates the lack of plausibility in Counts I and

II, on the more specific ground of governing statutory structure.   A transfer is avoided as

constructively-fraudulent only if the referent debtor received less than reasonably equivalent value

for the subject transfer.  Here, Duke and King transferred money, more than $23 million, in order

to pay the price for assets it was purchasing.  Like any acquisition of a going-concern business, that

purchase was a contractual undertaking.  Duke and King's contractual obligation of payment was

a debt, *cf.* 11 U.S.C. §§ 101(12) and (5); that debt was antecedent to the closing on the purchase.

Under the state law Kaye invokes for his constructive-fraud theory,

> [v]alue is given for a transfer . . . if, in exchange for
> the transfer . . . an antecedent debt is secured or
> satisfied . . . .

Minn. Stat. § 513.43(a), and

> [f]air consideration is given for property . . . [w]hen in
> exchange for such property, . . . an antecedent debt
> is satisfied.

N.Y. Debt. & Cred. Law § 272(a).

In treating the payment of debt under the analysis of a constructively-fraudulent

transfer, the courts uniformly recognize that reduction of preexisting debt, dollar-for-dollar in

proportion to the amount of payment, gives a reasonable equivalence to the transfer; and hence

the payment is sheltered from avoidance.  *E.g., In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141,

1145 (9th Cir. 2013); *In re SE Waffles, LLC*, 702 F.3d 850, 857 (6th Cir. 2012); *In re First Alliance

Mtg. Co.*, 471 F.3d 977, 1008 (9th Cir. 2006); *In re Petters Co., Inc.*, 499 B.R. at 358-359.[53]

In this light, and on Kaye's specific theory of suit, it is irrelevant whether the

purchase price was too high for the quality of the assets--and Kaye's insistence on that fact

allegation is beside the point.  With no allegation of fraud on the Nath Defendants' part, or collusion

between the Nath Defendants and Duke and King, the satisfaction of Duke and King's contracted

debt to the Nath Defendants is to be recognized as a bargained exchange of equivalents.  Under

the pleaded facts, the making of this payment could not be actionable as a fraudulent transfer.

Intuitively, the gravamen of Kaye's claims against the Nath Defendants under a

constructive-fraud theory just felt *wrong.*  It was initially hard to isolate and articulate the reasons

---

[53]The threshold proposition, from the face of the statute, is that "value" includes the satisfaction of
an antecedent debt.  *In re Rosen Auto Leasing, Inc.*, 346 B.R. 798, 805 (B.A.P. 8th Cir. 2006).

why it was.[54] But on the fundamentals just discussed, it cannot be denied: there is no plausibly-pled basis for relief in favor of Kaye and against the Nath Defendants, in avoidance of Duke and King's payment of the purchase price to them as a constructively-fraudulent transfer.  And, the lack of merit of this theory of recovery is so fundamental, a grant of leave to amend would be futile.  The balance of Counts I and II are to be dismissed on their merits, as against the Nath Defendants.

### b. As to the Kinderhook Defendants (Counts III - VI)

On the Kinderhook side of the defendant-constituency, Kaye did sue out other theories of liability premised on the various payments of fees to the Kinderhook Defendants.  Those claims sound under law from outside the statutorily-created governance of the bankruptcy process: the action for breach of directors' duties under Counts V and VI.

Those claims are made only against the natural persons among the Kinderhook Defendants.  An award of damages under them might include recoveries commensurate to the amount of the fees Duke and King paid; but the claims against the individuals do not target the payments themselves as intrinsically capable of legal invalidation by avoidance as a precursor to a recovery.  There is only a single overlap between the groupings of Kinderhook Defendants separately sued under fraudulent-transfer and breach-of-duty theories: Paul Cifelli, sued in avoidance of his individual receipt of a transaction fee from the Nath acquisition and sued also for breach of duty.  The remainder of the parties sued under Counts III - VI for avoidance of transfers are Kinderhook entity-defendants.[55]

---

[54]In arguing for dismissal, the Nath Defendants' counsel touched only on the edges of the rationale just used.  In arguing the deficiencies of Kaye's pleading, counsel dwelt more on Kaye's lack of specificity in tying particular defendants to the receipt of the impugned transfer.  The Kinderhook Defendants gave some help, augmenting their co-defendants' argument by pointedly stating at the hearing that "a bad investment is simply not enough" to make out a fraudulent transfer, actual or constructive.  That statement was not much, but it held the thought.  The systemic failure of the theory of suit makes it unnecessary to get into the adequacy of pleading as to the liability of individual defendants, for either group.

[55]Defendant Rodger Head, previously identified as the CEO and president and a director of Duke and King, 2007-2010, was sued in avoidance of his receipt of one transaction fee.  He is not a member of the Kinderhook Defendants' movant-group and the claims against him are not at bar.

The point of this observation is that, again, the adequacy of Kaye's fact-pleading against the Kinderhook entity-defendants on constructive fraud must be gauged in light of the nature, reach, and requirements of that very specialized remedy--which Kaye invoked at his own choice.  The avoidance remedy has its proper domain; it cannot be stretched to reach transactions and transfers that might in hindsight be judged unwise, improvident, or even contributory to the losses of later-contracting creditors of the transferor, through a bare chain of causation.  And the rules through which liability for damages might be imposed on a transferor or a transferee under other and very different legal theories do not import into the law of fraudulent transfer, and should not influence its construction by implication in any way.

In suing the Kinderhook Defendants under the rubric of constructive fraud, Kaye essentially challenges the fairness and propriety of certain benefits and other measures that those defendants reserved for themselves in the Nath and Swisshelm acquisitions and through the start-up of operations under Duke and King's corporate form.  His insinuation is that those measures were self-serving in the inception and predatory in the end, and that justice cries out now for the recompense of Duke and King's creditors.

The general notion of not extending fraudulent-transfer law beyond a proper domain has its attractiveness for the treatment of a plea made so stridently.[56]  However, it is not necessary to rule using that in justification.  The statutory prescriptions for a case of constructive fraud are specific enough to gauge the adequacy of Kaye's fact-pleading.  Their application splits the result

---

[56]One deep point should be mentioned, though it has nothing to do directly with the legal merits or the policy considerations.  Every last one of the trade suppliers that extended credit to Duke and King's operation did so on its own risk.  Every one of them could have demanded documented assurance of Duke and King's ability to timely make good on invoices, and refused to supply if they did not get it.  Kaye builds too much of his case solely on accusations of a gross (and grossly-irresponsible) operational insolvency within Duke and King.  But he does not acknowledge the risk that any regular trade vendor assumes in supplying its goods.  The point now is, the alleged marginality of Duke and King's operations did not have to be a secret from any trade supplier that was essential to Duke and King's operation.  They all had the ability to demand some protection, even if they could not get certainty of payment.  If trade creditors took on risk to stay competitive, and did not do a more thorough-going evaluation of creditworthiness, they do not have a cognizable complaint of having been grievously defrauded in their own right . . . at least without more than has been alleged here.

under Rule 12(b)(6).  Counts III and IV get one outcome and Counts V and VI get the other.

As exhausting as Kaye's pleading is,[57] it does not map out an avoidable fraudulent transfer in the payment of the management fees.  The reason is that the execution of the MSA imposed a contractual duty on Duke and King to pay the management fees, and it gave a right to receive them to the Kinderhook entity-defendants.  This created a debt in the sense of the Bankruptcy Code, 11 U.S.C. §§ 101(5)(A) and (12), which became due as the deadlines for payment passed pursuant to the terms of the MSA.  The $350,000.00-odd that was actually paid in *partial* satisfaction of that debt abated the contractual liability dollar-for-dollar.  Hence there was value that was reasonably equivalent to the extent of the amounts paid.  *Supra* p. 55.

Kaye faults the Kinderhook individual defendants for structuring the MSA the way they did.  The insinuation is that its terms inflicted an excessive, unwarranted, and unearned burden on the operations of Duke and King.  Complaint, ¶ 158 (pleaded for fraudulent-transfer claims in Count V), 167 (pleaded for fraudulent-transfer claims in Count VI), and 190 and 193 (pleaded for breach of duty claims in Count VIII).  However, Kaye does not plead that the MSA was unenforceable under any principle of equity or the law of contract--as much as he impugns its terms as self-serving to the Kinderhook entity-defendants as insiders.  With no such pleaded challenge to the MSA's legal viability and no pleaded claim for equitable restitution or rescission, the MSA must be considered now as contractually enforceable throughout the term of performance under it.

Thus the resultant debt is not subject to challenge now, as to its enforceability as it accrued.  The consequence is that its past, partial satisfaction is not subject to avoidance on an accusation that the corresponding claim was excessive or unearned, i.e., that the claim had no value and there was no corresponding debt subject to satisfaction.

However, under Kaye's fact-pleading, the "transaction fees" paid to Defendant Cifelli

---

[57]The use of the present participle, and not the adjectival form, is deliberate.

and Kinderhook Industries, Inc. are not sheltered at this time by the same binding characterizations

of enforceable claim, obligated debt, and reasonable equivalence in the payment.  Kaye adequately

pleads the apparent absence of a preexisting written contractual commitment, any prior

memorialization of substance and obligation, any documentary corroboration, and any objective

manifestation of purpose behind the fees that were simply taken out of the funds assembled for the

purchases.  Complaint, ¶¶ 83 (Nath purchase) and 106 (Swisshelm purchase).  He asserts that a

contract for the transaction fees on the Nath purchase was not executed by brief, informal written

memorandum until the very date on which the closing occurred and the payment was made.

Complaint, ¶ 83.  He states that not even that much was done before the transaction fee on the

Swisshelm purchase was paid.  Complaint, ¶¶ 105-107.

On those assertions, and on the inference that any obligation was given no more

than a vague, bare titling of "transaction fee" at any point, Kaye is entitled at this point to the larger

inference he advances: these "fees" were taken off the top, from a large available pot of cash.  This

matches to his pleaded assertions that the transaction fees were not received on account of value

furnished to Duke and King by the recipients, previously or contemporaneously.  All this plausibly

pleads enough basic facts to make out a constructively-fraudulent transfer.[58]

To the extent that it happened otherwise, or there was cognizable value matchable

to the payments, the recipients can plead it and can defend accordingly.

The result is that Counts III and IV are not to be dismissed, as to their constructive

fraud theory.  Kaye has no duty to replead these claims with greater specificity.  Counts V and VI

do fail muster under Rule 12(b)(6), however.  The face of Kaye's full pleading establishes an

insuperable bar to relief on them, in the fundamental nonavoidability of the transfers.  Those counts

---

[58]The insinuation is that the money was taken simply because it was there in bulk.  This cannot be
rejected out of hand on the pleadings.  That takes these transfers out of the policy-based considerations
previously applied--even though the larger purchase transaction has to be treated as fundamentally
legitimate because it was not pleaded to have been illegitimate.

are to be dismissed, with prejudice to repleading.

### C.  Reallocation of Parity of Defendants' Claims Against Liquidating Trust

Both the Nath Defendants and the Kinderhook Defendants have formally-evidenced claims in Duke and King's cases.

Four Nath-related entities filed proofs of claim.[59]  All of these claims are fairly characterized as contingent, from the provisos in their narrative content that the proofs were "being filed in the event that [the Nath-related claimant] is found liable for obligations under the Purchase Agreements" pursuant to which Duke and King bought the restaurant operations from the Nath Defendants.  The contingent liability is stated to arise from an asserted obligation in Debtor Duke and King Acquisition Corporation to indemnify the Nath-related entities from any loss related to misrepresentation or breach by Duke and King in or under the Purchase Agreement; any loss arising from the Debtors' post-purchase operations; and any liabilities assumed from the Nath Defendants in the sale.  None of the Nath Defendants' proofs of claim recite a sum-certain for the claims asserted in them.

When the Debtors filed their bankruptcy schedules, they included entries for claims for Kinderhook-related parties.[60]  As noted *supra* at n.19, p. 19, this gave the named Kinderhook entities the de jure equivalent of filed, and hence of allowed, claims.

In Counts VII and X of his complaint, Kaye seeks to deny both groups of defendants the right to share in distribution from the liquidating trust on a parity with other unsecured creditors.[61]

---

[59]The current versions of these claims bear nos. 231-2, 232-2, 233-1, and 234-1 in the clerk's claims register.

[60]A claim for "Kinderhook" (under that wording only) was included on Schedule F [Dkt. No. 113] in BKY 10-38652.  Entries, again, for "Kinderhook" appeared on the lists of 20 largest creditors that were filed early in BKY 10-38652 and 10-38653.

[61]In other proceedings Kaye has stated that he held a reserve on account of these defendants' claims when he made his small initial distribution.

In his complaint, Kaye proposed three vehicles toward that end. Two were ripe at the commencement of suit and at the presentation of these motions: equitable subordination pursuant to 11 U.S.C. § 510(c) (as to both groups of defendants) and recharacterization as equity (as to the Kinderhook Defendants). The third, disallowance under 11 U.S.C. § 502(d), was not ripe at all when these motions were argued, but did ripen as to the Nath Defendants. The movant-defendants sought dismissal, as to the first two theories of both counts. The third may be addressed now as well.

## 1. Equitable Subordination

A remedy for equitable subordination was originally created by judicial ruling, and then codified with the passage of the Bankruptcy Code of 1978. *United States v. Noland*, 517 U.S. 535, 538 (1996); *In re Racing Servs., Inc.*, 340 B.R. 73, 76 n.3 (B.A.P. 8th Cir. 2006). It lies at 11 U.S.C. § 510(c), which provides, in pertinent part,

> (c) . . . after notice and a hearing, the court may–
>
>> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest . . . .

The Eighth Circuit first adopted a formalized test for § 510(c) in *In re Bellanca Aircraft Corp.*, 850 F.2d 1275 (8th Cir. 1988):

> (i) The claimant must have engaged in some type of inequitable conduct.
>
> (ii) The misconduct must have resulted in injury to the creditors of the [debtor] or conferred an unfair advantage on the claimant.
>
> (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].

61

850 F.2d at 1282. With the mandatory character of the operative verb "must," these elements must be found as fact to support the extraordinary remedy of equitable subordination.

Generally speaking, a claim based on actual pecuniary loss will not be equitably subordinated, absent sufficient evidence of "fraudulent or inequitable activity" by or on behalf of the claimant. *Wegner v. Grunewaldt*, 821 F.2d 1317, 1323 (8th Cir. 1987). "The level of misconduct necessary to support a claim for equitable subordination varies according to the relationship between the parties. If the claimant is an insider of the debtor, the court will closely scrutinize the claimant's conduct." *In re Spring Grove Livestock Exch., Inc.*, 205 B.R. 149, 162 (Bankr. D. Minn. 1997). The inequitable conduct need not relate to the creditor's claim, to support subordination. *In re Racing Servs., Inc.*, 340 B.R. at 77. It is also not necessary that the conduct have injured a particular class of creditor; a general injury to a debtor's creditors is sufficient. *Id.*

However, the mere receipt of preferential transfers does not qualify as inequitable conduct for § 510(c), even if the claimant-recipient was a corporate insider and even if the receipt was actionable under nonbankruptcy (state) law as a self-arrogated preference. *In re Bellanca Aircraft Corp.*, 850 F.2d at 1282. An insider's "failure to disclose significant facts regarding the debtor's financial condition" in material circumstances may be inequitable, but the nondisclosure must have caused injury to creditors to support subordination. *Id.* If an insider's conduct qualifies as a breach of fiduciary duty, it may merit subordination. *In re Minnesota Kicks, Inc.*, 48 B.R. 93, 106 (Bankr. D. Minn. 1985).

In its entirety, this body of local law sets a firm threshold for relief under § 510(c). Against its standard, the adequacy of Kaye's fact-pleading can be measured against the Nath and Kinderhook Defendants' challenges.

### a. As to the Nath Defendants

Within the text of Count X, Kaye's pleading on equitable subordination against the Nath Defendants is utterly minimal. He never specifies inequitable conduct by act or nature. There

is only an exhortation to the court as to what must be done.

In oral argument, Kaye's opponents dwelt at length on the complaint's lack of factual specificity for the elements of most of Kaye's theories of suit, including equitable subordination.  His attorney responded with the blandishment that it was all contained in paragraphs 1-116 of the complaint.  This was the grinding 23-page recapitulation that dwelt on Duke and King's insolvency and gave significantly less attention to everything else.

When pressed as to Kaye's theory for equitable subordination against the Nath Defendants, counsel admitted that Kaye did not classify them as insiders.  For the "gross misconduct" required, he pointed to the Nath Defendants' use of the Flame Report to induce the Kinderhook Defendants to buy, and he impugned that one document as "knowingly incomplete," "glowingly inaccurate," and "never updated."

Even if pleaded, this sole allegation would fail under binding precedent.  It would even though the source  of the Nath Defendants' contingent claim and the conduct impugned as inequitable have a tangential connection, in the process through which Duke and King committed to purchase and the terms under which it then did.  At most, Kaye's fact-pleading depicts the Nath Defendants obtaining a commitment for a price acceptable to them, and then snapping it up.  Kaye hints that the datedness and alleged incompleteness of the Flame Report made its proffer fraudulent in some way.   No stronger or more pointed inference can be taken from his long narrative.

Then, the  remainder of the pleaded facts give the lie to that thrust.  They recite that the Kinderhook Defendants engaged their own consultant; they got their own evaluation; they never demanded anything more exacting from the Nath Defendants; and then they relied on both reports in deciding to purchase the restaurants.  There is no allegation that the Kinderhook Defendants operated under any sort of disability or disadvantage; that they were gulled to the point of fraud; or that they were victimized in any way.  (About the most pled in that vein, is the statement that the

Kinderhook Defendants had never before invested in fast-food franchises or operated them. Complaint, ¶ 2.)  There certainly is no allegation of duress or predatory overreaching on the Nath Defendants' part, or unbalanced bargaining power or unequal access to relevant information on the Debtors' part.

Beyond that, there is no fact-pleading of proximate causation, from the isolated proffer of the Flame Report to Duke and King's default in payment to its later-contracting trade creditors after several years of operation.

There is nothing cognizably inequitable about any of the behavior alleged, let alone the sort of pervasive inequity that binding precedent requires.  Kaye's fact-pleading does not plausibly state a case on which equitable subordination could be imposed on the Nath Defendants' claims.  Kaye had his shot at this theory of recovery; and in substance he could only allege hard bargaining on the Nath Defendants' part, against a party that was not disadvantaged in any way. That decisively fails as inequitable.  Count X must be dismissed as against the Nath Defendants-- and without leave to try again by amendment.[62]

### b.  As to the Kinderhook Defendants (Count VII)

Kaye's fact-pleading does feature more particularity and substance, to support his bid to subordinate the Kinderhook entity-defendants' claims.  However, even assuming the content of his pleading as established fact, the recitation is not enough to meet the Eighth Circuit's three-part test.

The relevant fact-averments are *not* marshaled into Count VII; it is just as bare and

---

[62]At oral argument, Kaye's counsel insisted that his client have an opportunity for discovery.  He tried to use the parties' current procedural posture to distinguish this matter from *In re Northgate Computer Sys., Inc.*, 240 B.R. 328 (Bankr. D. Minn. 1999), on which the defense heavily relied to attack his fact-pleading.  The effort to distinguish *Northgate* begged the point that Fed. R. Bankr. P. 9011 imposed on Kaye an obligation of pre-suit investigation into the facts and the evidence to make a prima facie case, and could not defer that by going ahead to sue and then relying on a bare recitation of a legal theory in his pleading.

conclusory as Count X is for the Nath Defendants.[63]  The fact-pleading is supposed to be found throughout that 116-paragraph narrative.

And what is there?  First, there is the accusation that the Kinderhook Defendants, individuals and entities, acted negligently in the way the capital structure and start-up financing for Duke and King were planned, arranged, and obtained, leaving the enterprise insolvent.  Assuming the truth of that, any such dereliction is neither fraudulent nor inequitable in character within the meaning of § 510(c).

In this regard, it is important to remember that the failure of Duke and King resulted in the Kinderhook Defendants losing their own equity investment and the return on it that they planned for and expected through the formation and launch of the enterprise.[64]  It is immaterial how their loss compared to trade creditors' losses; the respective outcomes for the different constituencies have no bearing on the equitable or inequitable character of the Kinderhook Defendants' original acts.  There is no basis in Kaye's complaint to brand the Kinderhook entity-defendants with an intent to cause any of the losses, or any reasoned way on which to infer that. This conduct cannot qualify as inequitable for the purposes of subordination under § 510(c).

Second, Kaye seems to take great exception to the Kinderhook Defendants' actions in setting up the MSA under which they were to be the contractors paid substantial fees for ongoing management, and in extracting substantial "transaction fees" for the individuals from the funding at the closing of the purchases.  However, he points to only three aspects of the acts, to tar them as inequitable.

The first is the lack of a pre-closing written agreement between the Kinderhook-

---

[63]Under Count VII, Kaye prays for equitable subordination as a remedy alternate to recharacterization--presumably, of second priority in his wishes.

[64]The conclusion that the Kinderhook Defendants expected such a profit is, again, the only reasonable surmise to be made from the facts.  Kaye has never alleged the only other conceivable motivation, to loot through a bustout scheme.

related recipients and Duke and King, to justify and memorialize the charging and payment of the

transaction fees at closing.  The second is the accusation that the charging of the fee, and then the

imposition of the MSA, were not the result of arms-length negotiation between the liable party and

the beneficiary, given the common control and ownership among Duke and King and the

Kinderhook-related entities and individuals.  The third is a veiled outrage at the magnitude of the

obligations and the amounts paid to satisfy them (though ultimately, only in part).

One has to wonder about the sincerity and bona fides of imposing such

characterizations in hindsight--across the divide of the great financial crash of 2008, in the wake

of the huge tightening of credit it prompted, and after the chastening they brought to bear on so

many previous excesses within the entrepreneurial and financial sectors in the United States.

Could such actions really have been a predatory skimming by the insiders of a doomed enterprise,

without heed of the interests of trusting and hard-working trade suppliers, as Kaye implies?

Perhaps--though cognizable only in hindsight and from a partisan perspective . . . but only perhaps.

The events here took place in a different world--with free-flowing credit funding all sorts of

channeled cash flows in bulk, and much overwrought injection of capital into acquisitions and

mergers.  The mind-set of the Kinderhook individual defendants would have been characteristic of

that world.  However foolish that time's pervasive heedlessness of risk, that is the surrounding

against which inequitableness or equitableness would be weighed--even now.

The difficulty of judging fairness now but in hindsight can be set aside; and still,

justifications for the fees are suggested by the surrounding circumstances that Kaye does plead.

The recipients might have been rationalizing the undifferentiated, late-charged "transaction fee" as

a recovery of due diligence costs for their purchase and compensation for their investment of

personal time into the purchase.  An even more logical explanation is possible, for the management

fees:  once operations at nearly 100 locations were under way, somebody had to cope with the

complexities of accounting, administration of tax liabilities, and financial management; and that

66

service had to be paid for.  If that was behind the self-contracting and payment of the management fees, there was the rationale--and it would not be an inherently unfair one.

The point of these observations does *not* go to the value of the consideration for the legal commitment or the actual payment of these fees.  Those points have their place in considering avoidance as a constructively-fraudulent transfer, *supra* pp. 56-60.  But for equitable subordination, a discrepancy of value, even of some magnitude, does not evidence such a systemic wrong as to merit the brand of inequitable.

Finally, to the extent that Kaye brands as inequitable the actual payment of these charges to the Kinderhook Defendants as insiders, the binding precedent flatly rejects that.  The payments may have been preferential in the sense of non-bankruptcy law; but the mere making such payments to insiders under color of contractual entitlements was not deeply unfair--inequitable--in the sense of § 510(c).  This is so even if insiders were preferred and outside trade creditors' claims may have mounted.  *In re Bellanca Aircraft Corp.*, 850 F.2d at 1282.

The one remaining, possible thrust of Kaye's fact-pleading on the issue of equity is more diffuse.  It is so diffuse that the point might not even be there.  If Kaye's point is that the Kinderhook Defendants acted irresponsibly on an inadequate capital structure and drove the operations of Duke and King into the ground, and that equity compels the subordination of their claims to match, the suggestion lacks plausibility.  It ignores the fact that the Kinderhook Defendants forwent payment on the bulk of the accrued fees under the MSA, for the several years prior to the bankruptcy filing.[65]  The franchises were still attractive enough to bring in prospective buyers, even with the tarnish of bankruptcy.  They engaged in an active and competitive bidding process.  There was enough residual value in the franchises and operations that the claim of the Bank of America was paid off and several large attendant claims were satisfied from the sale

---

[65]Again, this is evidenced by the claim based on the MSA that was scheduled for the Kinderhook entity-defendants.

proceeds.

Binding precedent establishes that equitable subordination of a creditor's claim is merited only on proof of pervasively-tainted conduct, that directly resulted in the loss of enterprise value, the accrual of significant debt not otherwise chargeable to the debtor, or other direct harm to creditors' interests generally.[66]   Whether the Kinderhook entity-defendants' conduct was negligent, or whether it resulted in transfers avoidable as constructively-fraudulent, Kaye's fact-pleading does not plausibly make out a case for the alternate relief that he seeks under Count VII. Nothing would be served by a grant of leave to amend; Kaye brought forth all the facts he had and they are not enough.   Count VII, therefore, is to be dismissed as to the Kinderhook entity-defendants, to that extent.

### 2. Recharacterization of Kinderhook Defendants' Lending to Equity: Plausibility of Pleading (Count VII)

Kaye's other main theory for realignment runs against the Kinderhook Defendants and their claims.  Count VII raises it, but virtually as an afterthought:

> In fairness and equity to the estate's general unsecured creditors, the Kinderhook claim should be recharacterized as equity.

Complaint, ¶ 178.

The remedy invoked here is extraordinary, judicially created, and potentially sweeping in its application.  Yet, in written submissions for these motions, Kaye and the Kinderhook Defendants alike treated it as an afterthought.  The Kinderhook Defendants devoted one page to it in briefing.[67]  Kaye's counsel completely ignored it.

---

[66]Thus, in *In re Racing Servs., Inc.*, the engagement of the corporate debtor's individual principal in criminal conduct through the instrumentality of the debtor merited the subordination of her post-petition, administrative-expense claim for unpaid facility rent.  The results of her conduct--a conviction and the prospect that all of the debtor's assets would be forfeited to the federal government--were adjudged prejudicial to creditors' interests in a sufficiently pervasive way.  340 B.R. at 76.

[67]Notice of Motion and Motion for Dismissal [Dkt. No. 22], 17.

The lawyers then gave lip service to the issue in oral argument.  However, they did so in wholly conclusory fashion:

- Kaye's lawyer made reference to the fact that the Kinderhook Defendants had "put another $2 million into" Duke and King after formation, "but not by equity, rather by loans," which put "Kinderhook *pari passu*" with other creditors, "rather than by equity as it should have."

- The Kinderhook Defendants' lawyer responded by pointing out the magnitude of what his clients had injected into Duke and King after its formation ($2.5 million), and summarily asserted their right under nonbankruptcy law to designate how such an infusion was characterized.  Kaye's argument had been that their status as insider deprived them of the right; and they rejected that as utterly without merit.

- The Nath Defendants' counsel chimed in that Kaye had nowhere alleged that the Kinderhook Defendants' later lending into Duke and King had been planned from the beginning.  She asserted this was a crucial hole in any case for recharacterization on the basis of intent versus substance.

- In a final rejoinder, Kaye's lawyer could only say that the decisions the Kinderhook Defendants made while they were in control of Duke and King "aren't untouchable," and that their choice "to do it by debt rather than equity" could be undone by recharacterization.

Counsel's submissions were pitifully inadequate from all sides.  The worst was Kaye's defense of his pleading and the way in which he outlined his potential case.  In the end, Kaye produced nothing.

The relative harshness of that pronouncement is fully merited.  This particular form of relief presents large complexities for its application in the bankruptcy process.  Case law from the last several decades features a high degree of controversy in the courts over its availability, governance, and propriety.  The Eighth Circuit Court of Appeals has not spoken at all to recharacterization in the bankruptcy context.  The remedy has not been treated in this district in a published or unpublished decision from the bankruptcy docket.  The federal appellate courts have

adopted at least three different standards for application.

Given all this, Kaye had the obligation to develop and plead a coherent legal and factual theory for recharacterization, and then to present a sound policy argument for its adoption. He did nothing of the sort. He did not even acknowledge the choice-of-law issue for recharacterization that springs from the same circumstances as the one on his claims for breach of fiduciary duty: if state law governs or structures the requisite proof on which recharacterization would be appropriate, would Delaware law apply? Would New York's? Or would Minnesota's?

In oral argument, Kaye's counsel did not isolate any particular part of the fact-pleading toward the recharacterization theory. He only pointed to the bare making of an infusion structured as a lending, and its contemporaneity with the operating insolvency of Duke and King, as the reason for relegating the lending-based claims of the Kinderhook Defendants to the lowest-rung status of shareholding.

In consequence, the Kinderhook entity-defendants' attack on this aspect of Count VII is quite basic. It is more a blunt frontal denial than a particularized analysis against a factor-based standard or a weighing-in-equity. Unadorned, their argument is: this little does not suffice. And they are right, no matter which standard governs the imposition of recharacterization and furnishes the measure of Kaye's fact-pleading on it.

A preliminary: at least seven circuits have recognized that the bankruptcy court has a power in equity, granted under 11 U.S.C. § 105(a), to recharacterize debt as equity, i.e., to deem contributions by shareholders or other participants to have been equity investment rather than lending. This recognition is generally justified on the ground of promoting the Bankruptcy Code's scheme for prioritization of distribution. *In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc. ("In re Dornier Aviation")*, 453 F.3d 225, 231 (4th Cir. 2006). *See also*, *e.g.*, *In re SubMicron Sys. Corp.,* 432 F.3d 448, 454 n.6 (3d Cir. 2006); *In re Hedged–Invs. Assocs.,* 380 F.3d 1292 (10th Cir.2004); *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 748–49 (6th Cir. 2001); *In*

70

*re Airadigm Comm'ns, Inc.*, 616 F.3d 642, 658 (7th Cir. 2010).[68]

The courts have identified differing sources for that power, i.e., the statutory authorization to impose the remedy.[69]  There are also three tests or standards for the power:

>    1.    The Eleventh Circuit's "objective" test, that requires debt to insiders to be recharacterized as equity whenever the insider's advance had been made at a time when no independent, disinterested lender would have extended credit to the debtor.  *In re N & D Props., Inc.*, 799 F.2d 726, 733 (11th Cir. 1986).

>    2.    A totality-of-the-circumstances test, considering multiple identified terms of the particular insider-debtor relationship and characteristics of the advances in question; all bearing on whether the infusion "appears to reflect the characteristics of . . . an arm's length negotiation."  *In re AutoStyle Plastics, Inc.*, 269 F.3d at 747-753.  *See also In re Dornier Aviation, Inc.*, 453 F.3d at 233-234.

>    3.    If applicable state law allows recharacterization, an importation of its standard.  *In re Lothian Oil, Inc.*, 650 F.3d 539, 542-543 (5th Cir. 2011), *cert. denied*, 132 S.Ct. 1573 (2012).

As an example of such state law, Minnesota jurisprudence allows a court, "in the exercise of its equitable powers, [to] set aside a transaction or ignore the form of that transaction, particularly where the parties are in a confidential or fiduciary relationship."  *Schaub v. Kortgard*, 372 N.W.2d 427, 430 (Minn. Ct. App. 1985).  The nomenclature used by parties in the original transaction is not controlling; the question is the end-resultant substance, for example "the creation of a debt" despite the transaction being "defined . . . in terms of stock."  *Booth v. Union Fibre Co.*,

---

[68]Only one appellate forum has held that a bankruptcy court does not have the power to recharacterize debt to equity, and that ruling came early in the development of the jurisprudence. *In re Pacific Express, Inc.*, 69 B.R. 112 (B.A.P. 9th Cir. 1986).  *See also In re Pinetree Partners, Ltd.*, 87 B.R. 481, 491 (Bankr. N.D. Ohio 1988) (following *Pacific Express*).

[69]The justifications have been found to spring from 11 U.S.C. § 105, in enforcement of 11 U.S.C. § 726; and 11 U.S.C. § 502(b).

137 Minn. 7, 9, 162 N.W. 677, 679 (1917).   Under this body of law, a "shareholder's loan to the corporation may, after a consideration of all the facts and circumstances, be treated as a contribution of capital."  *Schaub*, 372 N.W.2d at 430.   The extant Minnesota case law does not make it clear whether the factors recognized in the bankruptcy-generated federal decisions should be considered among "all the facts and circumstances."  The Minnesota state courts' approach has emphasized the relevance of a preexisting fiduciary or confidential relationship.  It is not clear whether insider status, measured by control or structure, is essential.  *Schaub*, 372 N.W.2d at 430.

The multi-factor standards used by the circuits that adopt that approach are recognized to be very similar, essentially identical in their essence.  *In re Dornier Aviation, Inc.*, 453 F.3d at 234 n.6.  By and large, they borrow from the articulations of federal case law in the area of taxation, from contexts where a classification between investment and lending is required.  *Id.* at 233-234;  *In re Autostyle Plastics, Inc.*, 269 F.3d at 749-750 (both using commonly-cited enumeration of factors from *Roth Steel Tube Co. v. Commissioner of Internal Revenue*, 800 F.2d 625, 630 (6th Cir. 1986), *cert. denied*, 481 U.S. 1014 (1987).

Most of these factors reflect that the expectation of the infusing  party is a key underlying consideration: was it anticipated that the infusion would be repaid according to fixed terms (and structured accordingly), and from future net revenues (making it look and function like "true" third-party debt); or was it intended to stabilize and strengthen business operations without imposing on the enterprise's future means in a strictly-structured and inflexible way, with any recovery to the infusing party to come more generally through shareholder dividends or appreciation in the value of equity?

It is hornbook law that the bankruptcy courts are not to use the vesting of equitable powers under § 105(a) as a warrant to create new remedies that would be at marked odds with other, specific provisions of the Bankruptcy Code.  *E.g.*, *Law v. Siegel*, 571 U.S. ___, ___, 134 S.Ct. 1188, 1194 (2014); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988).  To similar

72

effect, § 105 and inherent equitable powers do not allow the bankruptcy court to recognize substantive rights that do not exist under non-bankruptcy law. *Johnson v. First Nat. Bank of Montevideo*, 719 F.2d 270, 274 (8th Cir. 1983). *Cf. Butner v. United States*, 440 U.S. 48, 55 (1979); *Justice v. Valley Nat. Bank*, 849 F.2d 1078, 1084 (8th Cir. 1988) (in bankruptcy process, federal courts are bound by state law as to creation and definition of property rights).

The sparse phrasing Kaye uses to invoke recharacterization reflects his intention to do just that, i.e., to have the court exercise equity in a free-flowing fashion to create anew or to reclassify. His own, semi-articulated point is that *he* believes that the Kinderhook Defendants *should have* structured their infusions as equity investments, with no structured right to repayment. His judgmental "should" stems from his threshold accusation, that the Kinderhook Defendants ineptly undercapitalized Duke and King at the outset. So, he insists, when things then went badly they should have shouldered an even greater risk when they put in more money, by fastening that to their shareholder-equity rather than casting it as debt. On the basis of his opinion alone, he would have the court conclusively reorder the Kinderhook entity-defendants' status in the underlying cases.

This sort of approach would be consistent with the two-pronged test of the Eleventh Circuit. Under that, initial undercapitalization (obviously to be deemed the fault of corporate promoters) and corporate desperation at the time of the post-formation infusion (attributable in part to that early undercapitalization, blooming out to lack of creditworthiness in the open market), would justify a judicial shoehorning down into the lower status of equity, taking the lending shareholder out of competition with third-party creditors of the company in the priority of claims. The unspoken thought seems to be, "and that's just what they deserve."

The Eleventh Circuit test is not binding precedent in this jurisdiction. In its brevity and in its arrogation of broad judicial power to adjust after the fact, it stands alone among the appellate courts that have addressed recharacterization in the context of bankruptcy. It cites no

73

precedent for its holding.  Its test seems particularly rigid--much at odds with the weighing-and-balancing essence of equity.  It simply is not the rule to apply.[70]

This leaves a totality-of-the-circumstances approach, which is supported by the remainder of the existing authority whether one goes with a federal generation or the incorporation of state law.  Under such a rule of decision, Kaye's fact-pleading is nonexistent.  His complaint thrusts only toward the imposed, after-the-fact reordering he seeks.  That would be done in service of some sort of justice, to be accorded because Duke and King *eventually* failed and trade creditors were caught in the lurch.  But Kaye does not plead a bit of circumstance contemporaneous with the Kinderhook lending-in, that is consistent with an expectation on their part to not have a true creditor-status.  Given the gravity of the recharacterization remedy and its novelty in this jurisdiction, Kaye's utter failure on this account is particularly offensive.

On the most defensible legal theory to apply to it, Kaye's alternate request for relief Count VII fails utterly on plausibility.  Given these circumstances, he does not deserve an opportunity to replead.  Count VII is to be dismissed to this extent, as well.

### 3.  Disallowance Pursuant to 11 U.S.C. § 502(d)

Finally, Kaye seeks under Count X to have the Nath and Kinderhook Defendants' claims disallowed on a more general, administratively-oriented basis, 11 U.S.C. § 502(d):

> Notwithstanding [11 U.S.C. §§ 502(a) - (b)], the court shall disallow any claim of any entity from which property is recoverable under [11 U.S.C. §§] 542,

---

[70]The recent issuance of *Law v. Siegel*, 571 U.S. ___, 134 S.Ct. 1188, calls into question the continuing vitality of *N & P Props., Inc.*  In the Supreme Court's contemplation, remedies urged under arguments of equity are not properly imposed in the bankruptcy process to override the preexisting governance of objectively-framed legal rights under statute and procedural rule.  571 U.S. at ____, 134 S.Ct. at 1194.  Under the traditional structure of equity jurisprudence, the same limitation should apply to rights and liabilities that were privately seated intentionally and in facial compliance with general law, as long as there is no proof of inducement by improper or exploitive means.  There is one exception to this, under the traditional considerations: equitable remedies may lie where the reality of parties' intentions was contrary to the objectively-cast indicia of rights and duties, and fundamental fairness supports an override of what law, strictly applied, would demand.  But that requires specific pleading, and then compelling proof, to enable it.

> 543, 550, or 553 . . . or that is a transferee of a
> transfer avoidable under [11 U.S.C. §§] 552(f),
> 522(h), 544, 545, 547, 548, 549, or 724(a) . . . unless
> such entity or transferee has paid the amount, or
> turned over any such property, for which such entity
> or transferee is liable under [11 U.S.C. §§] 522(I),
> 542, 543, 550, or 553 . . . .

This request was premature when made, in Kaye's original complaint.  As to the

small fraction of Kaye's causes of action that survive these motions, it will be premature until (and

only if) Kaye gets a judgment against the remaining Kinderhook Defendant, Kinderhook Industries,

Inc. under Count III or Count IV.  *In re Odom Antennas, Inc.*, 340 F.3d 705, 708 (8th Cir. 2003).

*See also In re Midwest Agri Dev. Corp.*, 387 B.R. 580, 586 (B.A.P. 8th Cir. 2008).  As to the

remaining Kinderhook entity-defendants, it is not possible to determine whether disallowance under

§ 502(d) is premature at this time.  Given the uncertain identification on the Schedule F and the lists

of 20 largest creditors, it is unclear which one or ones among them qualifies as a holder of an

allowed claim.  Neither side even recognized this issue when they submitted their positions on this

motion.  Until that classification is forthcoming, Count X will not to be dismissed against any of the

Kinderhook entity-defendants.

However, as to all of the Nath Defendants the request for relief is now ripe for

disposition--against Kaye.  Given the dismissal of all claims against them, the liquidating trust will

not get a judgment against them.  As a result, there is no basis to disallow their claims on the

administrative-centered authority of § 502(d).  Count X is to be dismissed, as against the Nath

Defendants.

### III.  OUTCOME

All of the claims Kaye put into suit against the Nath Defendants, and the bulk of

those against the Kinderhook Defendants, fail at the pleading stage--some for want of a valid legal

theory of recovery, the balance for an inexcusable failure to muster supporting facts to plead out

a plausible basis on which he would satisfy essential elements under law.  There is no reason to

give Kaye an opportunity to replead on the failed counts and claims--given the patent lack of merit, the deficient legal theories for some of them, and the adequate opportunity he had to develop factual support for the arguable theories.  His suit against the Nath Defendants is terminated now in its entirety; that against the Kinderhook Defendants in part.

As to the surviving counts against the Kinderhook Defendants, Kaye's claims for breach of duty under Delaware law remain, their substantive merits unaddressed and the claims still subject to a potential statute of limitations defense.  Kaye must replead to factually support his late-coming invocation of Minnesota's statute of limitations via the borrowing statute.  On Kaye's counts for avoidance of Duke and King's payments to the Kinderhook Defendants as constructively-fraudulent transfers, suit may go ahead on his claims for avoidance of the payment of the "transaction fees" to Defendants Kinderhook Industries, Inc. and Cifelli.  The balance of those claims are to be dismissed.

## ORDER

On the rulings thus memorialized,

IT IS HEREBY ORDERED:

1.      Counts I and II of the Plaintiff's complaint are dismissed for failure to state a claim on which relief may be granted against Defendants Nath Companies, Inc., Nath Minnesota Franchise Group, Inc., Nath Illinois Franchise Group, Inc., Nath Florida Franchise Group, Inc., Nath Miami Franchise Group, Inc., Nath Minnesota Operating Group, LLC, and Nath Illinois Operating Group, LLC.  This dismissal is with prejudice to the filing of an amended complaint.

2.      Counts III - IV of the Plaintiff's complaint are dismissed for failure to state a claim on which relief may be granted under the theory of an actually-fraudulent transfer, against Defendants Kinderhook Industries, Inc. and Paul G. Cifelli.  This dismissal is with prejudice to the filing of an amended complaint, as to that theory.  As to the balance of claims pleaded in Counts III and IV (constructively-fraudulent transfer), those Defendants' motion is denied.

3.      Counts V and VI of the Plaintiff's complaint are dismissed for failure to state a claim upon which relief may be granted against Defendants Kinderhook Industries, LLC, Kinderhook Capital SBIC Fund I, LP, and Kinderhook Capital Fund I, LP.  This dismissal is with prejudice to the filing of an amended complaint.

4.      Count VII of the Plaintiff's complaint is dismissed for failure to state a claim on which relief may be granted against Defendants Kinderhook Industries, LLC, Kinderhook Capital SBIC Fund I, LP, and Kinderhook Capital Fund I, LP.  This dismissal is with prejudice to the filing of an amended complaint.

5.      As to Counts VIII and IX, the Plaintiff shall file an amended complaint setting forth facts to support the application pursuant to Minn. Stat. § 541.31 of a statute of limitations under Minnesota law, his original complaint establishing on its face that relief may not be granted against Defendants Robert Michalik, Louis Aurelio, Christian Michalik, and Paul G. Cifelli, because the claims are time-barred under the statute of limitations of Delaware law that the face of the complaint makes applicable pursuant to Minn. Stat. § 541.31(a)(1).  Those Defendants' motion for dismissal of Counts VIII and IX is denied, without prejudice.

6.      Count X of the Plaintiff's complaint is dismissed in its entirety as to Defendants Nath Companies, Inc., Nath Minnesota Franchise Group, Inc., Nath Illinois Franchise Group, Inc., Nath Florida Franchise Group, Inc., Nath Miami Franchise Group, Inc., Nath Minnesota Operating Group, LLC, and Nath Illinois Operating Group, LLC, for the Plaintiff's failure to state a claim on which relief may be granted against those Defendants.  This dismissal is with prejudice to the filing of an amended complaint.  To the extent that a claim for equitable subordination against Kinderhook Industries, LLC, Kinderhook Capital SBIC Fund I, LP, and Kinderhook Capital Fund I, LP is pleaded again under Count X, Count X is dismissed to that extent as to those Defendants, with prejudice.  Those same Defendants' motion for dismissal of Count X is denied as to the Plaintiff's request for relief under 11 U.S.C. § 502(d), without prejudice.

7.      The Plaintiff shall file the amended complaint contemplated by Terms 2 and 4 of this order, by *April 21, 2014*.  Defendants Kinderhook Industries, LLC, Kinderhook Capital SBIC Fund I, LP, Kinderhook Capital Fund I, LP, Robert Michalik, Louis Aurelio, Christian Michalik, and Paul G. Cifelli shall file an answer by *May 2, 2014*.

8.      A status and scheduling conference will be set by separate order.  Counsel for the Plaintiff and the remaining Defendants shall attend by telephone, and shall be prepared to address scheduling for the prosecution of the remaining claims in suit.  The Plaintiff's counsel shall address with specificity the status of this adversary proceeding as against Defendant Rodger Head.

BY THE COURT:

*/e/ Gregory F. Kishel*

_____

GREGORY F. KISHEL
CHIEF UNITED STATES BANKRUPTCY JUDGE